```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF TEXAS

 3                         DALLAS DIVISION

 4
     UNITED STATES OF AMERICA,           )  3:20-cr-0054-N
 5           PLAINTIFF,                  )
                                         )
 6   vs.                                 )  DALLAS, TEXAS
                                         )
 7   DANIEL REY SETTLE a.k.a. "POLO",    )
             DEFENDANT.                  )  July 19, 2022
 8

 9
```

## TRANSCRIPT OF MOTIONS HEARING

## BEFORE THE HONORABLE DAVID C. GODBEY

## UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     **MS. MYRIA WYNN BOEHM**
                       UNITED STATES ATTORNEY'S OFFICE
                       NORTHERN DISTRICT OF TEXAS
                       1100 Commerce Street
                       Third Floor
                       Dallas, Texas 75242
                       myria.boehm@usdoj.gov
                       (214) 659-8664

Jeff Foster, RMR, CRR     (214) 753-2349

```
 1  FOR THE DEFENDANT:           MR. MARK L. WATSON
                                 MARK L. WATSON
 2                               5851 McCommas Blvd.
                                 Dallas, Texas 75206
 3                               mark@mwatson.com
                                 (214) 912-8181
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18
    COURT REPORTER:              MR. JEFF L. FOSTER, RMR, CRR
19                               United States Court Reporter
                                 1100 Commerce St., Room 1504
20                               Dallas, Texas 75242
                                 jeff_foster@txnd.uscourts.gov
21                               (214) 753-2349

22

23

24       Proceedings reported by mechanical stenography and
25  transcript produced by computer.
```

```
 1              MOTIONS HEARING -- JULY 19, 2022
 2                    P R O C E E D I N G S
 3          THE COURT:  So Defendant's motion, so I assume you want
 4  to go first.
 5          MR. WATSON:  Yes, sir.
 6          THE COURT:  Okay.  One of the questions I have is
 7  whether I have jurisdiction to order the BOP to do something
 8  about telephones.  I think normally I don't.  I'm predisposed to
 9  believe that I have jurisdiction over everything I want to, but
10  that's not necessarily a good impulse.
11          So that's something you might address as well as
12  whether it would be a good idea if I had the jurisdiction to
13  exercise it here.
14          MR. WATSON:  Okay, Judge.  I'll just go ahead and start
15  now.
16          Do you want me to stay here, Judge, or come up there?
17          THE COURT:  Either way.
18          MR. WATSON:  Your Honor, as is evident from this motion
19  we are requesting -- well, and just -- just for ground rules I
20  included the letter to the -- to the BOP from the Government just
21  for background for the Court to catch up on.  We aren't agreeing
22  to it or saying it's truthful or all accurate, but just as
23  background as general -- as a general storyboard for the history
24  of the phone issues.  So -- and if that's all right, I mean, I
25  put that in my motion that it's for purposes of just for
```

1 background.

2 We believe -- or we submit to the Court that the Court
3 does have jurisdiction, because -- well, if we -- theoretically
4 this involves Eighth Amendment, cruel and unusual punishment,
5 denying him phone privileges. And I know that there are other --
6 other issues involved about obstruction of justice and public
7 safety that -- that can crawl into the Eighth Amendment.

8 So we submit -- or I submit that -- that the Court does
9 have jurisdiction to order some basic -- some basic rights of a
10 prisoner or a detainee.

11 For instance, I think if -- this is -- this is a
12 Guantanamo -- you know, not allegory, I can't think of the right
13 word, but let's say they were putting them in an ice cold bath
14 every day. I think the Court could say, no, we're not going to
15 do that.

16 So I believe there is -- on a very fundamental basis
17 the Court does have jurisdiction or power over the BOP to -- I
18 would agree that the BOP is part of the executive branch
19 probably. I haven't really thought about it, but I'm sure it's
20 part of the executive branch. I might be wrong on that, but I
21 think it is.

22 But I think as far as the -- the -- the Government has
23 requested that he be denied access to outgoing calls and the
24 Internet. And so the -- as far as the jurisdiction issue goes we
25 also believe that that's an overreach on the part of the

1  Government to -- to -- I would submit that they -- if they did do
2  it with a hearing that it would have more -- more teeth, so to
3  speak, or more properly done, but it was done without a hearing
4  or a motion by the Government.
5             It was -- it was done by a request and frankly I didn't
6  immediately fight it.  I thought it might inure to my client's
7  benefit to let him sit for a while incommunicado to,
8  quote/unquote, get his head right about what he should and
9  shouldn't be doing at Seagoville.
10            So I believe when it comes to his right of
11 communication, his -- his Sixth Amendment right to communicate
12 with me has been impacted.  He cannot e-mail me and I believe
13 that can be fixed in about four minutes.  I mean, I'm not overly
14 worried about that.  I believe that will be fixed probably by the
15 end of the day or tomorrow.
16            But -- now, he has -- if he -- and I agree that the
17 BOP, he was in the SHU for a while.  He was in confinement for a
18 period of time.  And I believe that the BOP/Seagoville can
19 restrict his privileges to keep order or to -- as a quote --
20 not a -- a sanction.  I wanted -- I started to say punishment,
21 but not really a punishment, but a sanction against prisoners.
22 You know, they can -- they can do things to keep order in a
23 prison or in a facility, and I do agree that they have that
24 ability -- the ability to do that.  And that makes sense that
25 they could restrict phone privileges or whatever, visitation,

1  while he's in either the SHU or detention or segregation.
2              However, in our situation, if I could -- if I could
3  inform the Court, he's been removed from the, quote/unquote, SHU
4  and I believe he is -- I'm 80 or 90 percent sure he's actually
5  been given maybe a higher status --
6              THE DEFENDANT:  An orderly.
7              MR. WATSON:  An orderly.  Thank you.  An orderly at
8  Seagoville.
9              So that's about as -- so as far as -- as far as the
10 Court having jurisdiction to -- to order this or maybe -- maybe
11 request it, maybe we don't have to go -- maybe we don't have to
12 go all the way to whether or not the Court has jurisdiction.
13             I submit that we don't -- I submit that in theory the
14 Court wouldn't have to -- we wouldn't have to address that in
15 this hearing if the Court urged the U.S. attorney to call over
16 there and communicate and say that we're -- we have agreed or we
17 have at the suggestion or urging of the Court, you know, allowed
18 him to have phone privileges.  Okay?
19             And so I really am not prepared mentally or
20 researchwise to get into whether or not the Court has
21 jurisdiction to order the BOP.  I believe they do.  Certainly
22 with my communication and -- and -- and -- a hundred percent on
23 that.  And I think just generally as his right to communicate as
24 with other prisoners.  Now -- with other detainees.  So as far as
25 the jurisdiction part, that's what I -- I've addressed that.

1        THE COURT:  Okay.  If I can clarify my question a
2   little bit, it sounds like a condition of confinement claim.
3   He's being held under unreasonable conditions and that typically
4   is a separate action.  And if it's brought as a separate action
5   against the BOP I certainly agree that I can address it.  I just
6   don't know that I can address it in the confines of the
7   underlying criminal prosecution.
8        And I think also in a condition of confinement case
9   there's certain exhaustion requirements that have to be followed
10  going up the change of command administratively within the BOP
11  and it's not apparent to me on the papers that that's been done.
12       MR. WATSON:  Correct, Judge.  You are right.  I have
13  not exhausted that.  And this case would probably be over -- or
14  at about the same time that -- that that would come to fruition
15  or all the remedies would be -- all the claims and counterclaims
16  and hearings and all the appeals -- I believe they would probably
17  come about at the same time to an end.
18       So I'm hoping that -- that the Court might either from
19  an ordering point of view or the pulpit maybe have some influence
20  on his terms of confinement.
21       THE COURT:  Okay.  Let's set the jurisdiction piece
22  aside and explain to me why I would want to do that.  Because I
23  gather the Government says he abused those privileges and was
24  tampering with witnesses in this case and it's just not a good
25  idea to --

1        MR. WATSON:  Yes, sir, Judge.  Your Honor, I'm not
2   saying it did or didn't happen.  And, again, for -- and to go
3   back to what I said in my opening part, I intentionally didn't
4   ask this to be reopened for three or four months thinking like
5   Cool Hand Luke, you know, the warden said get your head right.
6   And that -- and in that scenario Luke didn't get his head right
7   and he ended up getting killed.
8        But I believe -- and I represent to the Court -- I
9   believe that my client has addressed mentally some valid
10  restrictions on his phone calls and who he can and cannot call.
11       And certainly -- certainly the Court -- it's a pretty
12  big hammer to -- to impose down the road if -- if -- if he is
13  found guilty the Court could use a major hammer of -- of greatly
14  increasing his punishment if we were to come to court and say,
15  Judge, will you please let us call my two kids and my sister, and
16  then he goes and abuses the system again and tries to -- tries to
17  subvert justice.  You know, I'm not encouraging the Court to do
18  that, but that would certainly be a big hammer -- I mean, a huge
19  hammer that the Court could do.
20       And we're mostly asking for mercy.  I firmly believe
21  that the -- that the system can curtail his phone call ability
22  and his communication ability.  I have no qualms with the
23  Government's ability to do that.
24       I'm basically asking for, I guess, mercy or to make his
25  stay there more palatable and to let him show the Court if we do

1  get down -- if we -- if and when we do get to sentencing the
2  Government has to prove their case beyond a reasonable doubt,
3  two of them.  But if they were to get there on either one of them
4  we're certainly going to come before the Court at some point in
5  time and say, Judge, this is who we are.  This is my man.  We're
6  asking for a lenient sentence.
7           And, I guess, what we're also asking for is a chance
8  for him to start proving himself to the Court.  And maybe
9  that's -- you know, maybe -- maybe that's -- I don't think it's
10 silly to start saying that.  It's like a person being on bond.
11 He's been sanctioned.  And we're asking that he have a second
12 chance to start doing right in the BOP.  He is an orderly and I
13 think that shows the Court that he is -- he's done something
14 right at Seagoville.
15          And certainly -- and then another part of the
16 Government's argument is they don't have the resources -- the
17 BOP doesn't have the resources to monitor him.  Judge, I submit
18 to the Court all those phone calls are monitored anyway.  They --
19 I mean, one -- and I believe they have good control over the
20 complaining witness, the woman.  I haven't talked to her, but I
21 believe that she would tell them in about five minutes that he's
22 been trying to reach out to her.
23          And I think the Court could bring down the full weight
24 on him and for the duration of his -- his detention.  And then,
25 you know, certainly the Court could -- and we're not inviting

1   this, but the Court could obviously consider it down the road.
2           So basically it's -- we're just asking for mercy to
3   make his -- to give him some -- a better situation during his
4   confinement over there.  That's our main pitch, Judge.
5           THE COURT:  All right.  Thank you, sir.  What says the
6   Government?
7           MS. BOEHM:  Your Honor, first addressing the
8   jurisdictional issue, there's a difference.  Mr. Settle hasn't
9   been convicted.  He hasn't been sentenced and he is not currently
10  in the custody of the Bureau of Prisons.  It's a little bit
11  confusing because he is at Seagoville, but he is in the pretrial
12  section, which means he is in the custody of the United States
13  Marshals.
14          This Court and magistrate courts order the marshals to
15  do things all time.  We request separation of inmates.  And in
16  this particular case Judge Toliver ordered him to not contact the
17  victim.
18          Now, our response to Mr. Watson's request for a
19  carve-out exception for Mr. Settle to contact his family was
20  simply that we didn't oppose the motion, we didn't oppose
21  Your Honor hearing that, but that we as the United States
22  Attorney's Office would not agree to bind the U.S. Marshals and
23  members and staff of the pretrial detention facility at
24  Seagoville to baby-sit Mr. Settle or to try and figure something
25  like that out.

1                If this Court orders it or discusses with the
2  marshals -- we order the marshals to transport people all the
3  time.  I believe that you can order them to arrange his
4  communications in a certain way.  But the Government doesn't
5  believe that this particular request is realistic.
6                It would cause an unbelievable amount of burden on the
7  pretrial facility to accommodate this particular defendant,
8  especially since in our motion provided the Court two separate
9  cases talking about the right of the restriction of communication
10 for an inmate who is in custody.  Mr. Settle, in fact, has not
11 had all of his communication privileges restricted, just these
12 specific ones.
13               I believe his complaint is that he doesn't have the
14 most convenient option of communication available to him.  But he
15 does have physical visits, he does have letters and mail, and he
16 can communicate with his attorney.  So there's not some
17 unreasonable restriction on his rights.
18               Additionally, we requested this of the United States
19 Marshals and we notified them of his abuse of those phone
20 privileges in the same way we would advise them of the safety
21 concerns for inmates that needed to be separated.
22               This is a safety concern.  This case involves force,
23 fraud and coercion.  And Mr. Settle has demonstrated, we believe,
24 since the onset of this case that he is continuing coercive
25 behavior especially towards this victim.

1                He was specifically ordered by Judge Toliver not to
2   communicate with her.  And then after that in the presence of his
3   counsel -- not Mr. Watson, but Mr. Ireland -- the United States
4   Government with our office advised him again you may not
5   communicate.  That was the third time, because the Homeland
6   Security special agent had advised him when he was arrested
7   initially that he was not allowed to communicate with the victim
8   in this case.
9                And despite all those admonishments multiple times, him
10  understanding that it was a court order, not just our preference,
11  he continued to do it.  And he continued to even gain access, as
12  we had set out in our motion, to communication and telephones
13  outside of the actual allowable telephone access in a prison
14  system.  He had others on his behalf contact her.
15               So we certainly understand his desire to communicate
16  with his children and his sister, but they can visit him and they
17  can write him letters.  It's a local facility.  It's not like he
18  is put someplace states away or even necessarily hours away from
19  the Metroplex.
20               We're not asking to restrict his communication
21  entirely, but he's proven that he cannot abide by the simple
22  rules and instructions of the Court.
23               THE COURT:  All right.  Thank you.  Mr. Watson, last
24  word.
25               MR. WATSON:  Yes, Judge, I have just been informed by

1  Mr. Settle that his visitation privileges has been zeroed out.  I
2  can go see him, but his family cannot go see him.  So his
3  children cannot visit him in person and so he doesn't have that
4  ability to do that.
5          His sister lives in Kentucky, which is not directly on
6  point, but it is an inconvenience.  But his -- his in-person
7  visitation has been curtailed, as I understand it.  His children
8  cannot come see him.
9          MS. BOEHM:  And, Your Honor, that was not any request
10 of the Government.  The letters that we submitted showed that we
11 simply requested telephone access be curtailed.  We did not
12 request that he be placed in the SHU.  That's the determination
13 of the facility.
14         MR. WATSON:  Judge --
15         (Discussion out of the hearing of the reporter.)
16         MR. WATSON:  Judge, that's -- we -- we just want to
17 clarify to the Court that he doesn't have the ability -- his
18 children do not have the ability to come see him, so that's all
19 we have, Judge.
20         THE COURT:  All right.  With regard to telephone
21 privileges I'm going to deny the motion.  I think given the
22 Defendant's prior lack of compliance, I'm not going to disturb
23 that administrative decision.
24         With regard to children visiting, I think his kids
25 ought to be able to see him.  And I --

```
 1              MS. BOEHM:  We don't have any objection to that,
 2   Your Honor, but we also understand that that's the decision of
 3   the facility he's in and the marshals' determination.
 4              THE COURT:  All right.  If you would convey back
 5   upstream to them that, I think, he ought to be able to see his
 6   kids, I would appreciate that word going back to them.
 7              MS. BOEHM:  I will, Your Honor, and I will request that
 8   if they have any specific reasons that we're unaware of that that
 9   has been restricted that they let us know so we can communicate
10   that to the Court as well.
11              THE COURT:  Okay.  I would appreciate that.  Yes, sir.
12              MR. WATSON:  Oh, and I hate to keep coming back for
13   more.  Could -- is it possible that his internet privileges could
14   be put back on so he could e-mail his children?
15              THE COURT:  I'm not going to disturb their decision
16   about electronic communications.  Anything else for today?
17              MS. BOEHM:  Not from the Government, Your Honor.
18              MR. WATSON:  But, Judge, certainly the Court could
19   encourage them to let them e-mail me, correct?
20              THE COURT:  Communication with counsel, yes.  I think
21   he needs to be able to communicate with his counsel.
22              MR. WATSON:  Okay.  Thank you, Judge.  Let me ask my
23   client --
24              (Discussion out of the hearing of the reporter.)
25              THE DEFENDANT:  I ain't talked to my kids in seven
```

```
 1  months.
 2              MR. WATSON:  I know.  I know.  But it could be used
 3  against you later.  Come on.
 4              THE DEFENDANT:  No, bro.
 5              MR. WATSON:  No.  Okay?
 6              THE DEFENDANT:  I don't know anyone being taken away
 7  from their kids, bro, and then cut off from their family, bro.
 8              MR. WATSON:  I know, but I don't want you to talk.
 9  Okay?
10              THE DEFENDANT:  I ain't been convicted of nothing.
11              MR. WATSON:  I know, but I don't want you to talk.
12  Okay?  All right, Judge, that's all we have today.
13              THE COURT:  All right.  Thank y'all for coming down.
14  At this time the Court will stand in recess.
15
16
17
18
19
20
21
22
23
24
25
```

1                         INDEX

2   Court's ruling......................................... 13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I, Jeff L. Foster, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 9th day of February, 2023.

/s/ Jeff L. Foster_____
JEFF L. FOSTER, RMR, CRR
United States Court Reporter
1100 Commerce St., Room 1504
Dallas, Texas 75242
(214) 753-2349