<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE NORTHERN DISTRICT OF TEXAS

 3                            DALLAS DIVISION

 4
        UNITED STATES OF AMERICA,        )  3:20-cr-0054-N
 5                    PLAINTIFF,          )
                                         )
 6      vs.                              )  DALLAS, TEXAS
                                         )
 7      DANIEL REY SETTLE a.k.a. "POLO,  )
                      DEFENDANT.         )  December 5, 2022
 8

 9

10                    TRANSCRIPT OF TRIAL PROCEEDINGS

11              BEFORE THE HONORABLE DAVID C. GODBEY

12                  UNITED STATES DISTRICT JUDGE

13                            VOLUME I

14
     A P P E A R A N C E S:
15

16
     FOR THE PLAINTIFF:        MS. MYRIA WYNN BOEHM
17                             MS. JORDAN GANZ
                               UNITED STATES ATTORNEY'S OFFICE
18                             NORTHERN DISTRICT OF TEXAS
                               1100 Commerce Street
19                             Third Floor
                               Dallas, Texas 75242
20                             myria.boehm@usdoj.gov
                               jordan.ganz@usdoj.gov
21                             (214) 659-8664

22

23

24

25
</pre>

```
 1   FOR THE DEFENDANT:          MR. MARK L. WATSON
                                 MARK L. WATSON
 2                               5851 McCommas Blvd.
                                 Dallas, Texas 75206
 3                               mark@mwatson.com
                                 (214) 912-8181
 4
                                 -and-
 5
                                 MR. MARK A. PEREZ
 6                               MARK A PEREZ, P.C.
                                 3300 Oak Lawn Avenue, Suite 700
 7                               Dallas, Texas 75219
                                 perezlaw@swbell.net
 8                               (214) 752-0505

 9

10

11

12

13

14

15

16

17

18
     COURT REPORTER:             MR. JEFF L. FOSTER, RMR, CRR
19                               United States Court Reporter
                                 1100 Commerce St., Room 1504
20                               Dallas, Texas 75242
                                 jeff_foster@txnd.uscourts.gov
21                               (214) 753-2349

22

23

24        Proceedings reported by mechanical stenography and

25   transcript produced by computer.
```

```
 1            TRIAL PROCEEDINGS -- DECEMBER 5, 2022

 2                  P R O C E E D I N G S

 3            THE COURT:  Okay.  Be seated.  Good afternoon.  I hope

 4   you-all had a nice, although late, lunch break.  Again, I

 5   apologize for being so late on that and I very much appreciate

 6   your patience with us.  We are ready to go here.

 7            I'm going to first read to you the long version of the

 8   instructions that I didn't do before our lunch break, and then

 9   talk a little bit about some housekeeping things, and then we'll

10   be ready to get started.

11            So first these instructions.  Members of the jury, now

12   that you have been sworn I will give you some preliminary

13   instructions to guide you in your participation in the trial.  It

14   will be your duty to find from the evidence what the facts are.

15   You and you alone will be the judges of the facts.  You will then

16   have to apply those facts -- apply to those facts the law as I

17   will give it to you.  You must follow that law whether you agree

18   with it or not.  Nothing I may say or do during the course of the

19   trial is intended to indicate what your verdict should be.

20            The evidence from which you will find the facts will

21   consist of the testimony of witnesses, documents and other things

22   received into the record as exhibits and any facts that the

23   lawyers agree to or stipulate to or that I may instruct you to

24   find.

25            Certain things are not evidence and must not be
```

1    considered by you.  I will list them for you now.  One,

2    statements, arguments and questions by lawyers are not evidence.

3         Two, objections to questions are not evidence.  Lawyers

4    have an obligation to their clients to make objections when they

5    believe evidence being offered is improper under the rules of

6    evidence.  You should not be influenced by the objection or by my

7    ruling on it.  If the objection is sustained, ignore the

8    question.  If it is overruled, treat the answer like any other.

9         If you are instructed that some item of evidence is

10   received for a limited purpose only, you must follow that

11   instruction.

12        Three, testimony that I have excluded or told you to

13   disregard is not evidence and must not be considered.

14        Four, anything you may have seen or heard outside the

15   courtroom is not evidence and must be disregarded.  You are to

16   decide the case solely on the evidence presented here in the

17   courtroom.

18        There are two kinds of evidence, direct and

19   circumstantial.  Direct evidence is direct proof of a fact such

20   as testimony of an eyewitness.  Circumstantial evidence is proof

21   of facts from which you may infer or conclude that other facts

22   exist.  I will give you further instructions on these as well as

23   other matters at the end of the case, but keep in mind that you

24   may consider both kinds of evidence.

25        It will be up to you to decide which witnesses to

1    believe, which witnesses not to believe and how much of any

2    witness's testimony to accept or reject. I will give you some

3    guidelines for determining the credibility of witnesses at the

4    end of the case.

5              As you know this is a criminal case. There are three

6    basic rules about a criminal case that you must keep in mind.

7    First, the Defendant is presumed innocent unless and until proven

8    guilty. The indictment brought by the Government against the

9    Defendant is only an accusation, nothing more. It is not proof

10   of guilt or anything else. The Defendant, therefore, starts out

11   with a clean slate.

12             Second, the burden of proof is on the Government until

13   the very end of the case. The Defendant has no burden to prove

14   his or her innocence or to present any evidence or to testify.

15             Since the Defendant has the right to remain silent, the

16   law prohibits you from arriving at your verdict by considering

17   that the Defendant may not have testified.

18             Third, the Government must prove the Defendant's guilt

19   beyond a reasonable doubt. I will give you further instructions

20   on this point later, but bear in mind in this respect a criminal

21   case is different from a civil case.

22             Now, a few words about your conduct as jurors. First,

23   I instruct you that during the trial you are not to discuss the

24   case with anyone or permit anyone to discuss it with you. Until

25   you retire to the jury room at the end of the case to deliberate

1   on your verdict, you simply are not to talk about this case.

2   This includes electronic communications about this case.  Do not

3   send any e-mail about this case.  Do not post any comments about

4   this case on any Internet site or any social media.  Do not blog

5   about the case, do not send any text messages or tweets regarding

6   the case.  This includes even anonymous posts and posts that do

7   not specifically identify the case.

8          You can inform people that you are serving on jury duty

9   and unavailable, but do not otherwise communicate any information

10  to any person by any means regarding this case.

11         Second, do not read or listen to anything touching on

12  this case in any way.  If anyone talks to you about it or tries

13  to talk to you about it, bring it to my attention promptly.

14         Third, do not try to do any research or make any

15  investigation about the case on your own.  This includes any

16  investigation regarding any fact or matter or person in this case

17  through the Internet, including sites such as Google or

18  Wikipedia.

19         Finally, do not form any opinion until all the evidence

20  is in.  Keep an open mind until you start your deliberations at

21  the end of the case.

22         If you want to take notes during the course of the

23  trial you may do so.  However, it is difficult to take detailed

24  notes and pay attention to what the witnesses are saying at the

25  same time.  If you do take notes be sure that your note taking

1    does not interfere with your listening to and considering all of

2    the evidence.

3          Also if you do take notes do not discuss them with

4    anyone before you begin your deliberations.  Do not take your

5    notes with you at the end of the day.  Be sure to leave them in

6    the jury room.

7          If you choose not to take notes, remember that it is

8    your own individual responsibility to listen carefully to the

9    evidence.  You cannot give this responsibility to someone who is

10   taking notes.  We depend on the judgment of all members of the

11   jury.  You all must remember the evidence in this case.

12         If you do not follow these instructions regarding juror

13   conduct during this trial it may result in a mistrial and we may

14   have to begin the trial all over again with another jury.  Then

15   all of the time and expense incurred in this trial will have been

16   wasted, including the time of the parties, the lawyers and their

17   staff, the witnesses, the Court and its staff and the jurors.

18         If a juror intentionally violates these instructions

19   regarding juror conduct, that juror may be subject to punishment

20   for contempt of court, including possible fines or incarceration.

21         If you become aware that another juror is not following

22   these instructions regarding juror conduct during this trial, you

23   should inform me of that immediately.

24         The trial will shortly begin.  First, the Government

25   will make an opening statement, which is simply an outline to

1   help you understand the evidence as it comes in.

2          Next, the Defendant's attorney may, but does not have

3   to, make an opening statement.  Opening statements are neither

4   evidence nor arguments.  The Government will then present its

5   witnesses and counsel for the Defendant may cross-examine them.

6          Following the Government's case the Defendant may, if

7   he wishes, present witnesses whom the Government may

8   cross-examine.

9          After all the evidence is in I will instruct you on the

10  law and the attorneys will present their closing argument to

11  summarize and interpret the evidence for you.  After that you

12  will retire to deliberate on your verdict.  Which concludes the

13  instructions.

14         I'm going to say just a couple of things about

15  housekeeping for you and then the lawyers will get started.  Our

16  general working day will be from 9:00 to 5:00.  I will take a

17  break about halfway through the morning and again halfway through

18  the afternoon.

19         Today since we're starting late I'm hopeful we can

20  press on through to the end of the day and not need to take a

21  break.  If anybody needs a break before then, just let me know

22  and we'll be happy to accommodate that.  I will typically have

23  lunch from 12:30 to 1:30 for a good hour before we did today.

24  Again, I'm sorry about that.

25         We would like for this to be as painless a process as

```
1  it can be for you.  If anything occurs to you during the course
2  of the trial where you think we can do something that would make
3  this better for you, please let us know and we will be happy to
4  try and accommodate that.  I can't guarantee that we can
5  accommodate every request, but if we don't know about it we can't
6  even try.  So as I say, if something comes up that you would like
7  for us to address, please let us know.
8            And I think that's more than enough for me.  Is the
9  Government ready to proceed with openings?
10           MS. BOEHM:  We are, Your Honor.  Is the Court taking
11 the time down or do I need co-counsel to?
12           THE COURT:  I'll take it down.
13           MS. BOEHM:  Thank you, Your Honor.  May I have a
14 two-minute warning?
15           THE COURT:  Two?
16           MS. BOEHM:  Yes, Your Honor.
17           THE COURT:  Yes.
18           MS. BOEHM:  Thank you.  May I begin?
19           THE COURT:  Yes.
20           MS. BOEHM:  All right.  May it please the Court,
21 Counsel.  Good afternoon, Ladies and Gentlemen of the Jury.  We
22 are here and I am very thankful I get to take my mask off.  I
23 apologize that you don't get to.  If it makes you feel any better
24 we all have to when we're sitting at counsel table.
25           My name is Myria Boehm.  I'm an Assistant United States
```

1  Attorney here in the Dallas office and it is my job, along with

2  co-counsel Jordan Ganz, to bring this case before you.  As you

3  heard in jury selection it's our job to present you with

4  evidence.  We are the ones responsible for that.  We have to do

5  that and we will.

6          Our plan today is to present you with a very

7  straightforward case, at least in the Government's estimation.

8  This is not argument, but like Judge said simply a roadmap to let

9  you know what you will be looking forward to, what you may not be

10 looking forward to, but ultimately what you are going to hear and

11 this is our belief about it.  Okay?

12         This is a sex trafficking case.  Count one charges the

13 Defendant with trafficking or causing an adult victim, AV1, to

14 engage in commercial sex activity knowingly or in reckless

15 disregard of the fact that she is being caused to do that through

16 force, fraud, coercion or any combination of those.  Okay?

17 That's a lot of technical words.  You are going to have people up

18 on that witness stand explaining to you every step along the way

19 what that means.  Okay?

20         We talked a little bit in jury selection about

21 prostitution, should it be legal.  Special Agent John Kochan is

22 from Homeland Security Investigations.  He's worked federal sex

23 trafficking crimes cases for years and he is going to walk you

24 through his training, his experience, what the law is and how he

25 observes and takes a case in in order to have the best outcome in

1   his estimation on the end in order to bring that case to justice,

2   whether it's by charging or whether it's by even disproving.

3   Okay?

4           So what he's going to do is he's going to define to you

5   what we mean by pimp, right?  There's terminology used in this

6   area of the law and these activities that you might not know.

7   Okay?  Pimp is the same as sex trafficker.  It's somebody who

8   causes someone else to engage in commercial sex activity, sexual

9   activity for money, okay, and takes that money, controls that

10  person and is essentially the boss.

11          But what we're talking about with sex trafficking in a

12  federal sense is that force, fraud and coercion element, because

13  AV1, Adult Victim One, is the person who Daniel Settle

14  trafficked.  He caused her at some point during the charged time

15  period, so between March 2020 and January 2021 -- at some point

16  during that time period he caused her to engage in commercial sex

17  acts for money by force, by fraud, by coercion and by a

18  combination of all of those things.  That is illegal.

19          Since she is an adult -- she had just turned 18 at the

20  time she met Daniel Settle in about March 2020.  Just turned 18.

21  She's an adult, so we have to prove the force, fraud and coercion

22  elements of that.  Okay?

23          He's going to walk you through the pimp and the victim

24  dynamics, how those relationships work, how they're different,

25  right?  Not every single situation is going to be the same, but

1   there are common terms, there's common scenarios and common

2   situations that he investigates all the time and he'll describe

3   those to you.

4          And then he'll talk about his investigation into

5   Mr. Settle in particular with Adult Victim One.  He'll tell you

6   how he got started with a phone call from her mother, how he then

7   took the facts that she gave him and he investigated.  He got

8   phone records, he looked on the Internet and found sex ads that

9   had her picture, phone numbers that came back to her.  He

10  interviewed police officers and found out when they were together

11  during that period.  He tried to interview Adult Victim One at

12  the very beginning and she didn't want to.  She was uncooperative

13  and he'll talk to you about how that happens.  Everybody is

14  different in whether or not they want to accept help or not and

15  at what point they do, if they ever.

16         He'll talk to you about how during his investigation he

17  later found out that in May of 2020 Adult Victim One was found in

18  the middle of Harry Hines Boulevard in Dallas, Texas stabbed over

19  21 times.  How she almost died, how she checked herself out of

20  Parkland Hospital against medical advice.  He took her home.

21         He'll talk about how at some point after that during

22  the summer of 2020 she was back out.  She was back out working

23  and doing commercial sex acts at his direction.

24         He'll talk about how at one point Dallas police, who he

25  works with in these investigations, had the opportunity to take

one of her phones as evidence and how that was searched and how there was communications between the Defendant and her about this commercial sex where he's directing her, "You have a thousand dollar a day quota.  Make it."

She asked, "Can I come home?"

And he said, "Have you made your quota?"

She says, "Can I eat?"

He says, "No."

He calls her a bitch.  He degrades her.  He puts her down.  And he manipulates her through a cycle of domestic violence that you'll hear talked about from various witnesses in this case.

Just those texts alone you will see the force, the fraud, the coercion.  How she took money that she made using her own body and turned it over to him, because those were the rules of his family.  You'll see how in those text messages he used that force and manipulation when he told her in the midst of arguments, "You almost died because you weren't following instructions."  Whose instructions?  His instructions.  "You almost died because you were out of pocket, because you weren't following my instructions."  And in the middle of that argument he's accusing her of not following his instructions.  It's a threat.

You'll see all of that, all of this evidence that law enforcement gathered and brought here to put forward to you

1   through evidence and witnesses, and you'll get to judge that.

2             But you'll hear from the officer who found her in the

3   middle of the road in May 2020.  You'll hear from the detective

4   with the Dallas Police Department, Dustin Hatch, who also did an

5   incredible amount of work on this case and followed up with

6   records such as Cash App, a sex ad he found that referred to AV1

7   as Sunshine.

8             Well, those Cash App records he's going to tell you in

9   Daniel Settle's account had Sunshine giving him over $1,200 in

10  just electronic transfers, but that he accepted cash as well.

11            He's going to tell you how he frequently saw

12  Adult Victim One walking "The Blade," which is an area of Harry

13  Hines in Dallas where commercial sex workers and prostitutes walk

14  and solicit sex from customers.  He's going to talk about the

15  hotels that they used to complete those commercial sex acts.

16            And he's going to tell you how he eventually gathered

17  enough evidence to get an arrest warrant on the state side for

18  Daniel Settle and that's how he arrested him in January of 2021.

19  Searched his house, found him with Adult Victim One and another

20  individual, how he was taken into custody and then he was

21  interviewed.

22            You're going to get to hear portions of that interview.

23  You are going to get to hear how Daniel Settle admitted that he

24  pimped Adult Victim One.

25            THE COURT:  Two minutes.

1          MS. BOEHM:  Thank you, Your Honor.  You're going to get

2     to hear how he admitted to officers that he convinced girls to do

3     things for him, including commercial sex.  He admitted that he

4     told her, Adult Victim One, that she was -- that she was stabbed

5     in 2020 because she wasn't following his instructions.  And he'll

6     admit that he physically assaulted her on occasion.  He admits

7     it.

8          But then part two of this case comes in and that's

9     count two, which is obstruction of an official proceeding.  That

10     official proceeding is this criminal case, what he was charged

11     with and knew he was charged with at the time of his arrest.  And

12     how for a year afterwards he tried and attempted to influence

13     Adult Victim One's testimony and cooperation in this case.

14          You'll hear how he was instructed by a United States

15     federal court not to have contact with her because she was a

16     named victim in the case.  How he argued with the Court about it,

17     how the Court said no.  How he said it was impossible for

18     somebody -- for him not to contact -- or it was impossible for

19     him to contact somebody who didn't want to be contacted and how

20     she wanted it.  The Court said no.  He makes one last ditch

21     effort and claims that she's pregnant.  The Court says no.  But

22     after that for almost an entire year he continues to contact her.

23          You're going to hear from Adult Victim One.  She's

24     going to sit on that stand and she is going to tell you her story

25     and you will be able to listen to her, the good, the bad and the

1    ugly.  No victim is perfect.  But you're going to understand from

2    her words why she did the things she did, why she said she loved

3    him, why she may actually have loved him.  Why she feels guilty,

4    why she feels sorry and why she kept answering those phone calls.

5    And you're going to hear in her own words what he did to hear

6    while she was engaging in commercial sex acts and how she was

7    doing that at his direction and how at times she would get beaten

8    for not doing it.

9              THE COURT:  You need to wrap up.

10             MS. BOEHM:  Thank you, Your Honor.  You are going to

11   have the chance to judge her credibility.  That's your job.  And

12   she's not just going to talk about the good things, she's going

13   to talk about the embarrassing things.

14             Ladies and Gentlemen, in the end we're going to ask you

15   to examine the law on these two separate counts, sex trafficking

16   through force, fraud and coercion and obstruction of an official

17   proceeding where he attempted to influence her testimony.  He

18   attempted to obstruct this official proceeding.  And we have

19   great faith in you as jurors and judge of the evidence and we

20   believe that after all the evidence is presented to you and you

21   have considered that that you will find him guilty on both of

22   those counts.

23             THE COURT:  Does the defense want to open now or

24   reserve?

25             MR. WATSON:  Your Honor, respectfully the defense is

1   going to reserve our right to make an opening statement at a

2   later time.

3          THE COURT:  All right.  But as you probably could tell

4   from that, they have the choice, they can either do their opening

5   now or when the Government rests they can open then and they're

6   choosing to wait until then.

7          That being said, is the Government ready to proceed?

8          MS. BOEHM:  We are, Your Honor.  We would call Homeland

9   Security Investigations Special Agent John Kochan.

10         THE COURT:  If you'll come up here, please, sir, and

11  have a seat.  And if you want you can remove your mask while

12  you're testifying.

13         THE WITNESS:  Thank you.

14         THE COURT:  Could you raise your right hand, please?

15         (The witness was duly sworn.)

16         THE COURT:  The Government may proceed.

17         MS. BOEHM:  Thank you, Your Honor.

18            JOHN KOCHAN, GOVERNMENT'S WITNESS, SWORN

19                        DIRECT EXAMINATION

20  BY MS. BOEHM:

21  Q.   Will you please state your name for the record?

22  A.   Special Agent John Kochan.

23  Q.   And how are you currently employed?

24  A.   Homeland Security Investigations, Dallas, Texas.

25  Q.   Are you a special agent?

1  A.    Yes, I am.

2  Q.    How did you become a special agent?

3  A.    I began my law enforcement career in 1997 with the United

4  States Border Patrol.  I had a brief stint with the Salisbury

5  Police Department in Maryland, another stint with the Federal Air

6  Marshal Service again in Maryland.  And then in 2009 I accepted a

7  job with Homeland -- well, it was ICE back then, but it's the

8  same agency, Homeland Security Investigations.

9  Q.    How long -- so you said you have been in Homeland Security

10 Investigations since when?

11 A.    2009.

12 Q.    Okay.  What groups have you been a part of since you have

13 been employed by Homeland Security?

14 A.    When I was in Maryland from 2009 until roughly 2014 I was in

15 the gang -- Transnational Gangs Investigations group.  And then I

16 came down to Dallas in 2015 and was assigned to the human

17 trafficking group.

18 Q.    What group are you currently in?

19 A.    I'm currently in -- it's referred to as violent crime gangs

20 task force here in Dallas.

21 Q.    And how has the various experience investigating all the

22 different types of crimes that you just mentioned to the jury

23 aided you during the time frame that you were investigating sex

24 trafficking cases?

25 A.    When I was in Maryland we specialized in the transnational

1  gangs such as Mara Salvatrucha, 18th Street, Latin Kings.  And in

2  that area many of those gangs engaged in human trafficking

3  enterprises; that we assisted the actual human trafficking group

4  in investigating those.  Down here I've investigated numerous

5  human trafficking cases.

6  Q.   And what kinds of human trafficking cases have you

7  investigated down here in Texas?

8  A.   Sex trafficking and labor trafficking cases.

9  Q.   What's the difference between sex trafficking and labor

10  trafficking?

11  A.   Sex trafficking involves what we refer to as a commercial

12  sex enterprise where the victims are engaging in commercial sex

13  acts for money that is then turned over to the trafficker.  It

14  involves both adult and juvenile female victims primarily.  There

15  are male cases, but they're rare.

16           The labor trafficking, on the other hand, does not

17  involve sex, it's literally forced labor where a person is forced

18  to work a job and is barely paid anything, if they're paid at

19  all.  Their activities, movements and communication are

20  controlled as well.

21  Q.   And during your time investigating the various human

22  trafficking cases, did you receive extensive training as well as

23  your hands-on experience?

24  A.   Yes, I have.

25  Q.   What types of training do you receive?

```
 1   A.   You receive basic training while you're in the ICE criminal

 2   investigator training program on human trafficking cases.  I've

 3   also intended -- attended numerous seminars.  I've taught case

 4   studies at various conferences throughout the state of Texas.

 5   Q.   And have you had the occasion to work cases where there's

 6   more than one trafficker?

 7   A.   Yes, ma'am.

 8   Q.   Can you tell the jury a little bit about your experience in

 9   those cases?

10   A.   I've had several cases involving gangs down here where the

11   gang members were trafficking both adult and female victims

12   throughout Dallas-Fort Worth, the entire state of Texas over to

13   Florida and other states as well, where it involved gang members

14   that would basically pass their victims between each other.  They

15   would traffic numerous females.  Those females would, you know,

16   have issues with one pimp, who would then turn her over to

17   another pimp that's in the same gang.

18   Q.   Okay.  When we talk about the terminology pimp, is that the

19   same as sex trafficker?

20   A.   Yes.

21   Q.   Where does pimp come from?

22   A.   Pimp is just a term that has developed over the years and

23   indicating somebody who is engaging in sex trafficking.

24   Controlling the acts of the female victims who engage in

25   commercial sex at their direction.
```

1  Q.   Do you see that terminology used frequently in your cases?

2  A.   Yes.

3  Q.   Now, have you also had the opportunity to investigate cases

4  where there was only one such person, a pimp?

5  A.   Yes, I have.

6  Q.   And can those individuals have many victims or just one

7  victim?

8  A.   They can have many.

9  Q.   Can they also just have one?

10 A.   They can.

11 Q.   Through your investigations have you had the opportunity to

12 interview both sex traffickers and those who are potential

13 victims of sex trafficking?

14 A.   Yes.

15 Q.   You told the jury that you've had numerous instances.  What

16 are we talking about?

17 A.   I would say easily over a hundred traffickers and probably

18 twice that number in victims.

19 Q.   And those are just the ones you've interviewed?

20 A.   Correct.

21 Q.   Now, what would be the purpose of interviewing a sex

22 trafficker?

23 A.   There are several purposes for it.  One is to obtain

24 evidence or verify information that you've obtained in your

25 investigation, verify various facts that may have been provided

1   by the victims themselves to try and corroborate their stories or

2   to gauge further -- the potential for further victims that may be

3   involved in the case or other co-conspirators.

4   Q.   And is every trafficker or pimp you've interviewed the same?

5   A.   No.

6   Q.   Do they employ the same methods of control or force or

7   coercion?

8   A.   They -- all of them, yes, but it depends on the pimp, in

9   which manner that they're utilized.  Some pimps use force, some

10  use coercion.

11  Q.   Okay.  And are there different terms for these pimps?

12  A.   Yes.

13  Q.   Such as?

14  A.   A pimp that uses primarily force to control his victims is

15  commonly referred to as a gorilla pimp, whereas the pimp who

16  primarily uses coercion or fostering false relationships is more

17  of a -- like I refer to them as a Don Juan type pimp where they

18  just con the girls constantly into engaging in the commercial sex

19  act.

20  Q.   And is -- although the same types or similar techniques are

21  employed in the cases you've investigated, are any of them

22  identical?

23  A.   Any of the pimps?  No.

24  Q.   All right.  Or any of the victims?

25  A.   No.

```
 1   Q.   Can you please explain to the jury the personality in your
 2   experience of a trafficker?
 3   A.   The personality, they tend to be very strong personalities
 4   where I would refer to it as probably the far end of narcissism,
 5   where they engage in thinking everything they do is correct or
 6   the only way to be done, and if you're not doing it their way
 7   it's wrong.  They usually do not take ownership of any of the
 8   things that they've done.  They -- the violence is never their
 9   fault.  It's always something that the victim did that caused the
10   violence.  Very rarely will they just even admit to the violence
11   and say, yes, I did it.
12   Q.   Have you had the experience of interviewing these
13   traffickers or pimps while they were under investigation?
14   A.   Yes.
15   Q.   Have you interviewed them after they've been arrested?
16   A.   Yes, I have.
17   Q.   And have you even interviewed them after the case has come
18   to some final conclusion?
19   A.   Yes.
20   Q.   Does when you interview them in this criminal process matter
21   to how their case ends up ultimately resolving?
22   A.   No.
23   Q.   Do sometimes they not interview with you?
24   A.   Yes, there are some times that they will just refuse.
25   Q.   And are there instances where some might want to cooperate
```

1    at first and then refuse to continue later?

2    A.    Yes.

3    Q.    What are you ultimately trying to do when you're

4    interviewing a person suspected of sex trafficking?

5    A.    Ultimately I'm trying to get to the truth.  I'm trying to

6    verify the information that I've obtained through a different

7    manner, whether it be through subpoenas or witness testimony or

8    police reports.

9    Q.    And you had previously talked about also interviewing the

10   victims or potential victims.  How -- how do you ever come into

11   contact with people who are potential victims?

12   A.    We come in contact through several different manners.  Loved

13   ones may often call and report that they believe the victim is

14   engaging in -- or is trapped in a sex trafficking type situation.

15   We run operations where we attempt to locate victims who are, in

16   fact, being trafficked where we have in-call and out-call type

17   operations.  We get referrals from nongovernment organizations

18   throughout the North Texas area.

19   Q.    Is there any occasion where you've even come into contact

20   simply by being out in the field doing your investigations with

21   somebody who you believe is a victim?

22   A.    I'm sorry, clarify?

23   Q.    Is there ever an occasion where you might even personally

24   while you're out in the field doing an investigation come into

25   physical contact with somebody who might be a victim?

1   A.    Yes.

2   Q.    And what do you do?

3   A.    When I encounter a victim I always try to start basic

4   conversations to try and gauge how they're going to respond to

5   me.  And I'll usually go from there.  If a victim is cooperative

6   or maybe not -- not quite as cooperative as you want we take

7   what's called a victim-centered approach to where my first

8   questions are usually not investigative type questions, they're

9   more for how are you?  Like when was the last time you ate or do

10  you have any medical issues that are going on right now that you

11  might need to see a doctor for?  Do you have loved ones that we

12  can call and get you in contact with at this point?  That type.

13  Q.    And why would that be your approach if they're not

14  cooperative with you?

15  A.    The approach is trying to get them to earn -- you're trying

16  to earn their trust, to let them know that you're not a threat to

17  them.  Because they've often been conditioned by the pimp that

18  law enforcement is the enemy, that they're going to destroy the

19  situation that they have right now where it's a perceived family

20  type situation where the victim at least has a roof over their

21  house or may have some source of financial support.  There's

22  often threats from the trafficker like if you talk to -- if you

23  cooperate with law enforcement, you know, I'll harm you or I'll

24  harm your family type situations.

25  Q.    Have you ever come across victims who were themselves

1   combative with you?

2   A.    Frequently.

3   Q.    Frequently.  And in what ways?

4   A.    I've had them throw outright temper tantrums, throwing

5   objects in the room.  I've had them spit at me.  I've had them

6   get angry that we were even there.

7   Q.    And have you ever come into contact with a victim who

8   themselves has quite a lot of contact with law enforcement, for

9   example?

10  A.    Yes, there's often a lot of fear of personal interaction

11  with law enforcement for various reasons.

12  Q.    Because what's the nature of the acts that they're

13  committing?

14  A.    They're engaging in prostitution.

15  Q.    And is that illegal?

16  A.    It is.

17  Q.    Are they often homeless?

18  A.    Usually they are homeless.

19  Q.    And so do you stop your investigation simply because a

20  victim is not cooperative with you at the outset?

21  A.    No.

22  Q.    Why not?

23  A.    We continue to investigate in other manners.  We may pull

24  different records such as phones or social media records from

25  accounts that we've identified.  Hotel records, different types

1  of GPS location data that we can track.

2  Q.    Have you ever heard of the phrase no victim, no case?

3  A.    Yes, I have.

4  Q.    Is -- is that accurate?

5  A.    It's accurate -- more accurate -- I'm sorry, more often

6  accurate than not.  It's not always accurate, no.

7  Q.    And what does that mean?

8  A.    There are many cases where -- are you asking me what no

9  victim, no case means?

10 Q.    Yes.

11 A.    Okay.  It means pimps often believe that if the girls don't

12 come in and testify against them that there's no chance that they

13 will be convicted in court.

14 Q.    And in your experience what have you seen as far as efforts

15 by these traffickers to do just that, to prevent them from coming

16 in?

17 A.    They often reach out and, again, play on the emotions of the

18 victims.  They'll play on that fostered type

19 boyfriend/girlfriend, husband/wife style relationship,

20 establishing guilt.  I've seen cases where they have straight up

21 threatened them from prison.  I've seen cases where they may try

22 to relocate the victim to another area thinking that that will

23 somehow prevent the victim from testifying at trial.

24 Q.    Do you spend a lot of time locating victims?

25 A.    Yes.

1   Q.   And when you are trying to determine this relationship, does

2   the dynamic sometimes that you encounter of that uncooperative

3   victim at first -- does that sometimes change as your

4   investigation goes on?

5   A.   It usually does change.  Once the victim is removed from the

6   situation they kind of have a chance to catch their breath and

7   look at things from the outside and it kind of -- that light bulb

8   comes on in their head where they realize that the situation that

9   they were in was not healthy, was not productive for them and was

10  very controlling and just very dangerous in general.

11  Q.   And the work that you do investigating other things, such as

12  business records, surveillance videos, are you doing that to

13  corroborate any statements by the victim?

14  A.   Yes.

15  Q.   And is that part of a trust, but verify process?

16  A.   Yes.  When we talk to the victims, even when they're

17  completely cooperative, if they give us a story of events we

18  don't just take it at face value.  We have to go out and usually

19  obtain -- you know, if they say we were in Houston during a given

20  time period at this hotel we have to go out and attempt to get

21  the room receipts to verify that they were, in fact, there.  Or

22  search the databases and find ads for commercial sex

23  advertisements with their information in it that were placed in

24  that area during that time frame.

25  Q.   And those documents help you do that?

1    A.    Yes.

2    Q.    Now, you mentioned being part of the human trafficking unit

3    or squad at Homeland Security; is that correct?

4    A.    Yes, the North Texas Trafficking Task Force.

5    Q.    And were you part of that squad at the time that this case

6    was being investigated in March of 2020?

7    A.    Yes, I was.

8    Q.    And all the way through January of 2021?

9    A.    Yes.

10   Q.    Now, who do you collaborate and work with as a part of that

11   team?

12   A.    We have several federal, state and local police departments

13   throughout the North Texas area, including the Dallas Police

14   Department, for example, Fort Worth, all of the major cities,

15   Arlington, Irving.

16   Q.    And what's the point of having all of those agencies work

17   together?

18   A.    It's very beneficial in the fact that we can all share

19   information back and forth.  These commercial sex enterprises

20   tend to be very transient.  They will travel to wherever they

21   perceive they can make the most money.

22          So, for example, if there's a big sporting event in

23   San Antonio, a pimp will take his girls down to San Antonio where

24   they will engage in the operation there.  Or if there's a heavy

25   traffic out to, you know, the oil fields where they feel they can

1    make a lot of money out there, you'll see them move out in that

2    area as well.

3    Q.   Now, is it always the case that you begin an investigation

4    that ends with federal criminal charges?

5    A.   No.

6    Q.   Okay.  Why not?

7    A.   Well, first of all, I don't make the decision on who gets

8    charged.  I have to consult with the U.S. Attorney's office.  And

9    we have certain parameters that we look for.  Many of the cases

10   that I'm a part of start at the state level with the local police

11   departments.

12            MR. WATSON:  Objection, relevance.

13            THE COURT:  Overruled.

14   A.   And then they continue at the state level.  We don't feel

15   that federal prosecution would be warranted and they are then

16   prosecuted at the county or state level.

17   Q.   (BY MS. BOEHM)  Okay.  And so as far as the team, it's a

18   collaborative effort for those reasons.

19   A.   Uh-huh.

20   Q.   Okay.  Now, are you familiar with the particular case of

21   Daniel Settle, the Defendant here?

22   A.   Yes.

23   Q.   Were you the original agent assigned to the case?

24   A.   Yes, I was.

25   Q.   And at the time you started this investigation -- as I had

1  already asked you, you've already described the dynamics of the

2  group.  Were you working with any other local law enforcement

3  agencies?

4  A.   I was working with the Dallas Police Department and the

5  Texas Attorney General's office.

6  Q.   And since you had concluded your portion of that

7  investigation, have you since moved on to your new group?

8  A.   Yes, I have.

9  Q.   Now, in preparation for trial today, have you reviewed your

10  investigative materials related to the work that you did on this

11  case?

12  A.   Yes.

13  Q.   Can you tell the jury a little bit about how this

14  investigation started for you?

15  A.   In May of 2020 I was contacted by the mother of an

16  18-year-old female, where she believed her daughter was engaging

17  in prostitution, but was under the control of a pimp.

18          She stated that she had had several conversations with

19  her daughter --

20          MR. WATSON:  Objection, hearsay.

21          MS. BOEHM:  Your Honor, it goes to effect on the

22  listener.

23          THE COURT:  I'll sustain the objection as to the

24  contents of the statements from the mother to the special agent.

25          MS. BOEHM:  Okay.

1   Q.    (BY MS. BOEHM)   And Special Agent Kochan, after speaking to

2   the mother, what did you do?

3   A.    She provided a phone number for her daughter.  I used that

4   phone number to search a public database that we utilize that

5   specifically targets ads for commercial sex that are placed on

6   various websites in an attempt to obtain commercial sex

7   customers.  When I placed that phone number into the search

8   engine it returned several commercial sex ads in South Texas.

9   Q.    Did you know at that point what Adult Victim One looked

10  like?

11  A.    Yes.

12  Q.    And what were you able to see when you pulled up those

13  advertisements?

14  A.    The ads not only contained the phone number that the mother

15  had given me, it also contained photographs of a female that I

16  immediately recognized as her daughter.

17  Q.    Can you describe to the jury what is involved in a

18  commercial sex ad such as this?

19  A.    Just the overall enterprise or --

20  Q.    Well, what are you looking for when you're seeing if

21  something is actually an advertisement for commercial sex?

22  A.    They'll place it on various websites that are specifically

23  known for commercial sex, websites like Skip the Games or

24  Mega Personals.  Those ads will contain a manner of contacting

25  them such as a phone number.  It will also contain a location or

1    a city in which they're located.  It will often spell out the

2    types of acts that will be performed and the prices that will be

3    paid for the time periods for which they're purchasing them.

4    Q.   Can you please turn in that binder to Government's

5    Exhibit No. 3?

6    A.   Okay.

7         MS. BOEHM:  Previously for the record, Your Honor, they

8    have been admitted into evidence.

9    Q.   (BY MS. BOEHM)  Are you looking at No. 3?

10   A.   Yes, I am.

11   Q.   What is this?

12   A.   This is the commercial sex ads that were returned by that

13   search engine.

14   Q.   And these were the ones that you yourself pulled?

15   A.   Yes.

16   Q.   Using the phone number provided to you?

17   A.   Yes.

18   Q.   And in those advertisements do you see the language, the

19   dollar amounts in those indicative of commercial sex activity?

20   A.   Yes.

21   Q.   And you said that was for South Texas; is that correct?

22   A.   Several of these were San Antonio.  I believe one -- these

23   were San Antonio.  I'm trying to find -- McAllen, Corpus Christi.

24   There are several cities throughout the South Texas area.

25   Q.   And to be fair are those located in the Northern District of

1   Texas, those cities?

2   A.    No, they're not.

3   Q.    Why was this important to you in your investigation?

4   A.    Through speaking with the mother I knew that -- or I

5   believed that the -- her daughter had met her pimp here in Dallas

6   and traveled to South Texas.

7   Q.    Now, as part of your investigation you said you used the

8   phone number, put it in the search engine and found those ads,

9   which is Government's Exhibit 3, right?

10  A.    Correct.

11  Q.    How did you make sure that that phone number actually

12  belonged to someone relevant to you?

13  A.    We identified that the carrier for that phone number was

14  T-Mobile.  I sent a subpoena to them requesting subscriber

15  information as to who purchased or who the phone account was

16  registered to.

17  Q.    And when you make that type of request through a law

18  enforcement subpoena, do you receive information back?

19  A.    Yes, they respond.

20  Q.    And do they respond with a certification of any kind?

21  A.    Yes.  They send an affidavit attesting to the fact that

22  their records -- that the information they give to me is a direct

23  copy of the information contained in their records as to who

24  subscribed that phone.

25  Q.    And did you do that in this case?

1  A.    Yes, I did.

2  Q.    And did you receive such a certification?

3  A.    Yes.

4  Q.    Will you please look at Government's Exhibit 46?

5  A.    Sorry.  It's going to take a second.  Okay.

6  Q.    And is this a copy of the certification and attestation that

7  you received from T-Mobile regarding your request on that

8  specific phone number?

9  A.    Yes.

10  Q.    Does that appear to have been changed, altered or deleted in

11  anyway from the official records that you received?

12  A.    No.

13        MS. BOEHM:  Your Honor, at this time we'd offer

14  Government's Exhibit 46.

15        MR. WATSON:  Your Honor, we previously discussed it

16  with the Court.  It's agreed to.

17        THE COURT:  It's admitted.

18        MS. BOEHM:  Thank you, Your Honor.

19  Q.    (BY MS. BOEHM)  And then now if you'll flip all the way back

20  to Government's Exhibit 4, please.

21  A.    Okay.

22  Q.    And what are these records?

23  A.    This is the actual subscriber information returned by

24  T-Mobile.

25  Q.    And is that the subscriber information referred to in the

1  attestation in Government's 46?

2  A.   Yes.

3  Q.   Has that been changed, altered or deleted in anyway besides

4  being a copy?

5  A.   No.

6  Q.   And is that phone number on the T-Mobile subpoena the phone

7  number that you particularly requested and were investigating?

8  A.   Yes.

9       MS. BOEHM:  Your Honor, at this time we'd offer

10  Government's Exhibit 4.

11       MR. WATSON:  No objection, Your Honor.

12       THE COURT:  4 is admitted.

13  Q.   (BY MS. BOEHM)  Who did that phone number subscriber come

14  back to?

15  A.   The adult victim in this case.

16  Q.   Okay.  And what are her initials?

17  A.   CR.

18  Q.   Can you tell the jury a little bit about why we're referring

19  to her as adult victim or initials CR?

20  A.   In crimes -- or, I'm sorry, in investigations involving sex

21  offenses or anything where we -- we try to protect the victim's

22  identity as much as possible, so we don't put their full names

23  in.  We use either initials or identifiers like Adult Victim One

24  or Juvenile Victim One.

25  Q.   And do you establish at the outset of your investigation who

1  that specifically refers to?

2  A.   Yes.

3  Q.   Do you find out their full name during the investigation?

4  A.   Yes.

5  Q.   And is that full name often in your documentation to make

6  sure that's the same person?

7  A.   Yes.

8  Q.   So for purposes of your testimony here today when you refer

9  to AV1 or CR, are you referring to the exact same person you

10  investigated?

11  A.   Yes.

12  Q.   Now, throughout your investigation as well, did you have the

13  opportunity to keep track -- or did you have the opportunity to

14  actually encounter Adult Victim One and try to speak to her?

15  A.   Yes.   In May of 2020 Adult Victim One returned to the Dallas

16  area.   She went to a nursing home in Dallas to go and see her

17  grandmother, who was in the nursing home and was ill.

18  Q.   Did she want to talk to you?

19  A.   No.

20  Q.   Okay.   Did you press the issue at that time?

21  A.   Not very much, no.

22  Q.   And I'm going to back you up just a little bit, because did

23  you ever through your investigation verify that AV1 was in

24  southern Texas as the advertisements indicated?

25  A.   Yes, I did.

1    Q.   Did you find out through law enforcement if she was ever

2    found in any of those locations?

3    A.   Yes.  She was encountered in San Juan and by the San Juan

4    Police Department.  San Juan, Texas, which is on the border next

5    to McAllen.  They were encountered during what the officers

6    believed was some sort of domestic dispute.  There was no

7    violence at that point.  But it warranted police

8    interaction where --

9            MR. WATSON:  Objection, hearsay.

10           THE COURT:  Let's start with a fresh question.

11           MS. BOEHM:  Well, Your Honor, they're basing what

12   they're called out for.  They have to know the basis of the

13   complaint and how they respond.

14           THE COURT:  Yeah, I think at this point we just need a

15   fresh question.  I'm not saying move along to something

16   different, I'm just saying ask a new question.

17           MS. BOEHM:  Yes, Your Honor.

18   Q.   (BY MS. BOEHM)  Did police encounter them?

19   A.   Yes, they did.

20   Q.   Who did they encounter?

21   A.   They encountered Daniel Settle and CR.

22   Q.   And can you look at Government's Exhibit Number 1, please?

23   A.   Okay.

24   Q.   Who is that a picture of?

25   A.   This is Daniel Settle.

1  Q.   And do you see Mr. Settle sitting in court today?

2  A.   Yes, I do.

3  Q.   Can you please point to him and identify an article of

4  clothing he's wearing as well as his location in the courtroom?

5  A.   He is seated at the defense table next to counsel and he's

6  wearing a gray suit and has a light blue mask on his mouth.

7        MS. BOEHM:  Your Honor, may the Defendant pull down his

8  mask briefly for the witness to fully identify him?

9        THE COURT:  Yes.

10 A.   That's him.

11       MS. BOEHM:  And, Your Honor, may the record reflect

12 that the witness has identified the Defendant, Daniel Settle?

13       THE COURT:  Noted.

14 Q.   (BY MS. BOEHM)  Does Mr. Settle go by any names other than

15 Daniel Settle.

16 A.   Yes.

17 Q.   What are those?

18 A.   He uses the street name of "Polo."

19 Q.   So now you encountered Adult Victim One when she returned to

20 Texas, correct?

21 A.   Correct.

22 Q.   And that was in May of 2020?

23 A.   Correct.

24 Q.   Through your investigation are you aware of what happened to

25 AV1 later on in May 2020?

1   A.    Yes, I am.

2   Q.    And did you -- was that event important to you for your

3   investigation of this case?

4   A.    Yes.

5   Q.    And how did you get that information?

6   A.    I received a phone call from the Dallas Police Department.

7   Q.    And at that time you were working with the Dallas Police

8   Department as an investigative team in this particular case; is

9   that right?

10  A.    Yes.

11  Q.    And so was that information relayed to you by members of

12  your team?

13  A.    Yes.

14  Q.    And did it involve Adult Victim One?

15  A.    Yes, it did.

16  Q.    Can you tell the jury what information -- or can you tell

17  the jury simply what happened to Adult Victim One?

18  A.    Adult Victim One was in the area of Harry Hines and Walnut

19  Hill, specifically behind the Lipsticks Gentleman's Club, where

20  she was attacked and stabbed more than 20 times.  The police and

21  the medical personnel found her there and transported her to

22  Parkland Hospital for treatment.

23  Q.    And at some point did you come into contact with her mother?

24  A.    Yes.

25  Q.    Did you ever come into contact with Adult Victim One herself

1    in the hospital?

2    A.    Not in the hospital, no.

3    Q.    And based on your investigation, are you telling this jury

4    that Mr. Settle committed those acts?

5    A.    No.

6    Q.    And is that based on the investigation of the Dallas Police

7    Department as well as yours?

8    A.    Yes.

9    Q.    But did this occur during the time period that you believed

10   that Adult Victim One was being sex trafficked by Mr. Settle?

11   A.    Yes.

12   Q.    Can you describe to the jury your knowledge of that area of

13   Dallas, of Harry Hines Boulevard?

14   A.    Harry Hines and Walnut Hill and the little street that

15   shoots off of Walnut Hill, Shady Trail or what's commonly

16   referred to as "The Track" or "The Blade," it's known to be the

17   area where pimps will take their girls to walk on the street in

18   an effort to find and locate commercial sex customers.

19   Q.    And is that in the Northern District of Texas?

20   A.    Yes.

21   Q.    And based on your experience can you describe to the jury

22   how safe it is to be in that location?

23   A.    It's not safe at all to be in that location.  It's an area

24   of high crime that is frequently focused on by the Dallas Police

25   Department for various types of intervention.

```
 1   Q.   What do you know, based on your investigation, about how

 2   long Adult Victim One actually stayed in Parkland Hospital?

 3   A.   She was only there for a few days before she left Parkland's

 4   ICU against the wishes of doctors, and then she just kind of

 5   left.

 6   Q.   Okay.  At some point later after May 29th, 2020, did the

 7   Dallas Police Department obtain one of her cellular devices?

 8   A.   Yes.

 9   Q.   And did you have the opportunity to review the contents of

10   her cellular device?

11   A.   Yes, I did.

12   Q.   Now, why would that be important in your investigation?

13   A.   Cellular devices are huge in our investigations.  They

14   frequently contain communications between the pimp and the

15   victim, the victim and commercial sex customers, even the pimp

16   and commercial sex customers.  They contain a different web

17   history for maybe hotels or, you know, websites that they have

18   posted ads on, GPS locations that they might have gone where

19   hotels could be located or where they could have posted ads to

20   work or engage in the commercial sex enterprise.

21   Q.   And what happens when you get a cellular telephone from

22   somebody where you believe there's evidence of a crime on there?

23   A.   We write a search warrant, request a search warrant from the

24   Court.

25   Q.   And who did that in this case?
```

1    A.    The Dallas Police Department.

2    Q.    And then what happens after a search warrant is obtained?

3    A.    It's turned over to whatever they refer to as their digital

4    forensics unit at that department and they execute the search

5    warrant.

6    Q.    And was that done in this case?

7    A.    Yes.

8    Q.    Have you had the opportunity to review the forensic download

9    of Adult Victim One's telephone?

10   A.    Yes, I have.

11   Q.    And have you -- are you familiar with looking at forensic

12   downloads of telephones?

13   A.    Yes.

14   Q.    Do you do that on few or many occasions in your training and

15   experience?

16   A.    Many.

17   Q.    Do you know whether or not an actual certified and trained

18   professional did that download?

19   A.    I believe so, yes, from the Dallas Police Department.

20   Q.    Do you have any reason to believe that that would not have

21   happened?

22   A.    No.

23   Q.    And based on your review, do you believe that that download

24   was a full and accurate download of that cellular telephone?

25   A.    Yes.

```
 1   Q.   Now, can cell phone downloads sometimes be very large?
 2   A.   Yes.
 3   Q.   Would it be beneficial to the jury to just hand them over an
 4   entire phone dump?
 5   A.   No, in many cases you're talking about hundreds of gigabytes
 6   of data.
 7   Q.   And during your investigation did you have the opportunity
 8   to look at and pull portions of that forensic download that you
 9   believe to be relevant to your case and the case and
10   investigation involving the sex trafficking of Adult Victim One?
11   A.   Yes.
12   Q.   Have you reviewed Government's Exhibit 6, 7, 8 and 9?
13   A.   Yes, I have.
14   Q.   And do you believe that Government 6, 7, 8 and 9 are each
15   excerpts or portions of that forensic download that have been
16   separated from the full download itself?
17   A.   Yes.
18   Q.   Have you reviewed those?
19   A.   Yes, I have.
20   Q.   And do you believe that they have been altered or deleted in
21   any way that would be misleading to the jury?
22   A.   No.
23           MS. BOEHM:  Your Honor, at this time we would offer
24   based on a previous stipulation Government 6, 7, 8 and 9.
25           MR. WATSON:  That's correct, Judge.
```

```
 1              THE COURT:  They're admitted.
 2              MS. BOEHM:  Thank you, Your Honor.
 3  Q.  (BY MS. BOEHM)  Do you believe that going through those
 4  downloads would aid the jury in their understanding not only of
 5  sex trafficking as a whole, but the specific dynamics between
 6  Daniel Settle and Adult Victim One?
 7  A.  Yes.
 8  Q.  First, though, can you please turn to Government's Exhibit
 9  2?
10              MS. BOEHM:  Ms. Dara, can we please publish
11  Government's Exhibit No. 2?
12  Q.  (BY MR. BOEHM)  Do you know this person?
13  A.  Yes, I do.
14  Q.  Who is this?
15  A.  This is Adult Victim One, CR.
16  Q.  And this is her phone we're talking about?
17  A.  Yes.
18  Q.  And based on your review of the phone numbers and the
19  conversations, do you believe these excerpts are from her phone?
20  A.  Yes.
21  Q.  And the conversations between her and Daniel Settle?
22  A.  Yes.
23              MS. BOEHM:  Let's go ahead and take a look at
24  Government's Exhibit 7, please.  On page 1 of Government's
25  Exhibit 7, can we zoom in on this, please, to the e-mail address
```

1  in the redacted portion?

2  Q.   (BY MS. BOEHM)   So it's been redacted, but the redacted

3  portion 56@gmail.com, based on your review of the records who

4  does that e-mail belong to?

5  A.   I believe this is CR.

6  Q.   Okay.   And is that Adult Victim One?

7  A.   Yes.

8  Q.   And is that simply showing her possession of the phone?

9  A.   Yes.

10  Q.   Now, beginning on page 3 and going 3, 4, 5 and 6.

11  A.   Okay.

12  Q.   These conversations, the green is who?

13  A.   The green is AV1 or CR.

14  Q.   Okay.   Now, it says "mommy" in the name for that number; is

15  that correct?

16  A.   Correct.

17  Q.   But you said you know that number to be associated with AV1.

18  A.   Yes.

19  Q.   And is that also based on the context of all these

20  conversations?

21  A.   Yes.

22  Q.   And then the blue bubble, who does that belong to?

23  A.   Daniel Settle.

24  Q.   This is a 214-912 number.   Is that Daniel Settle or is that

25  someone else?

1  A.    Hang on.  No, that's her mother.

2  Q.    Okay.  To be fair, why is this confusing talking about

3  "mom," "mommy"?

4  A.    They're both labeled "mommy" and, I'm sorry, I saw they were

5  talking here.

6  Q.    Okay.  Based on the context of this conversation and the

7  pictures that are included, do you believe this is a conversation

8  between AV1 and her actual mother?

9  A.    Yes.

10 Q.    Now, turning to page 8.  In this particular download is AV1

11 still the green bubbles?

12 A.    Yes.

13 Q.    And the blue bubbles, even though you might not know the

14 exact identification -- well, why is this relevant to this

15 conversation?  What is this?

16 A.    They're talking about a commercial sex date.

17 Q.    Okay.  So how would somebody contact AV1 for commercial sex?

18 A.    If she's walking "The Track" they could approach her in a

19 car while she's walking and have a conversation, seeking a date

20 at that point.

21 Q.    Okay.  But what if she was posted online?

22 A.    They could reach out to the phone number contained in the

23 ad.

24 Q.    And would they maybe text her?

25 A.    Yes, it would predominantly be texting.

1  Q.   Okay.  And, for example, is this a text conversation between

2  AV1 and a potential commercial sex customer?

3  A.   Yes.

4  Q.   How do you know -- or what involved in this conversation is

5  actually related to commercial sex?

6  A.   A lot of it.  The first message, "Can I see your feet,

7  mama," it's referencing a foot fetish type situation.  He talks

8  about where he just met you in a white car, so apparently he

9  approached her at some point.  Then he starts talking about the

10  price, $80 for everything, and asks if she's heading to her room

11  now.

12  Q.   And is that referencing a hotel room?

13  A.   Yes.  And then she provides the address.

14  Q.   And now on page 11, it looks like item number 22 in that

15  forensic download, but is that another example of a conversation

16  AV1 had regarding commercial sex?

17  A.   Yes.

18  Q.   And specifically that first message at the bottom of page

19  11, why do you believe that that's referencing potential

20  commercial sex acts?

21  A.   We're talking about page 11 at the bottom?

22  Q.   Yes.

23  A.   He's asking if he's going to meet in a room or out in public

24  and, again, asks about the clean feet.

25  Q.   Okay.  And then if you turn to page 17 of Exhibit 7 in this

```
 1  same conversation, is there a picture?
 2  A.    There is.
 3  Q.    And without Zooming in on that picture, can you tell from
 4  your review who that picture is of?
 5  A.    It's CR dressed in a bra and underwear.
 6  Q.    Okay.  Because at the time you reviewed this, were you
 7  familiar with what CR looks like?
 8  A.    Yes.
 9  Q.    Okay.  Now, can you turn to Government's Exhibit Number 8,
10  please?  And Government's Exhibit Number 8 has the green
11  redacted; is that right?
12  A.    Yes, the user of the green.
13  Q.    Okay.  Now, can you tell the jury what is Textnow?
14  A.    Textnow is a texting application that you can put on a
15  digital phone or Smartphone where the records are not going to be
16  contained by your cell phone provider.  It's usually maintained
17  offsite, if they even keep them at all.  It's also a way of
18  texting anonymously, because you can get a separate phone number
19  for that application that will not correspond to your name
20  directly.
21  Q.    Okay.  But sometimes do you have Textnow that's actually in
22  people's correct identifying numbers or names?
23  A.    Yes.
24  Q.    For example, up at the top this phone number associated with
25  the contact saved as "mom," did you or your investigative team
```

1  identify that phone number?

2  A.   Yes.

3  Q.   And who did that phone number belong to, according to your

4  records and investigation?

5  A.   Daniel Settle.

6  Q.   Now, it's called "mom," though, right?

7  A.   Yeah.

8  Q.   So based on your experience is that -- is that typical?

9  A.   They'll hide the numbers, yes.  They're not going to put on

10 there that's my pimp or put somebody's actual name.

11 Q.   Why not?

12 A.   It's to evade law enforcement.  Or if he's actually checking

13 her phone she might put it under a different name that's not

14 threatening.

15 Q.   And did you have the opportunity obviously to review

16 Government's Exhibit 8?

17 A.   Yes.

18 Q.   And are there some terms contained in Government's Exhibit 8

19 that would aid the jury in their understanding of the pimp/victim

20 dynamic?

21 A.   Yes.

22 Q.   Now, specifically on the first blue bubble, which is Daniel

23 Settle's conversation, what does he mean by -- in your experience

24 what does he mean by disloyal?

25 A.   She's not following his instructions, doing what he says.

1  Q.   And then when we go to page 2 of this exhibit, they're

2  obviously in an argument; is that correct?

3  A.   I'm sorry, I didn't hear you.

4  Q.   They're in an argument; is that right?

5  A.   Yes.

6  Q.   So if we can zoom in on the second and third blue bubbles,

7  please.  Mr. Settle is saying, "Bitch, I can't even cap.  I ain't

8  never expected you to move like this."  What does that mean in

9  this context?

10       MR. WATSON:  Your Honor, objection, speculation.  The

11  jury can form their own opinion on what these conversations mean.

12       THE COURT:  Overruled.

13  A.   He's basically -- he didn't expect her to do whatever --

14  like he -- like whatever she is doing at that point in time.

15  Q.   (BY MS. BOEHM)  Okay.  And then on the last bubble at the

16  bottom he says, "You dead wrong and the game gonna spank the shit

17  out of you again."  What is the game?

18  A.   The game is an overall reference to a commercial sex

19  enterprise.  It encompasses recruiting girls to participate in

20  the commercial sex enterprise.  It encompasses the rules that are

21  laid down by the pimp for engaging in it, the obtaining of sex

22  customers, the placing of ads, all of the communication.  It's

23  all commonly referred to in an overall term of the game.

24  Q.   Okay.  And on the next page, please, the final blue bubble,

25  Mr. Settle says, "You are fortunate enough to come into this

1 under a real one and you don't appreciate shit."  What is a real

2 one?

3 A.   That's a term that I see frequently specific to a pimp,

4 claiming to be a real pimp as opposed to a fake pimp, which the

5 slang term for that is to use simp.

6 Q.   Now, on the next page in the top bubble --

7           MR. WATSON:  Your Honor, could we have a running

8 objection when he modifies or explains to the jury what it is?

9           THE COURT:  Yes.

10          MR. WATSON:  Thank you, Judge.

11 Q.   (BY MS. BOEHM)  The top one it says, "Now, instead of

12 dedicating your energy to the one that saw the 304 in you and

13 blessed you with this game."  What is the 304?

14 A.   304 refers to the term -- if you were to turn it upside down

15 on an old-fashioned calculator it would spell out hoe, H-O-E.

16 And, again, he's talking about he blessed her with this game.

17 He brought her into his commercial sex enterprise.

18 Q.   And specifically also on the third bubble down he references

19 birthing her into this life-style; is that right?

20 A.   Yes.

21 Q.   And do you see this kind of talk between pimps and victims

22 often in your experience?

23 A.   Yeah.

24 Q.   What's the point of this?

25 A.   It's control.  It's coercion.  It's dominance.  It's

1   establishing the relationship of who is in charge, who is

2   superior, who is going to be directing everything as opposed to

3   who is just going to be doing what they're told.

4           MR. WATSON:  And, again, Your Honor, objection on

5   speculation.

6           THE COURT:  Overruled.

7           MS. BOEHM:  And, Your Honor, we have a running

8   objection on that; is that correct?  We have a running objection

9   on that?

10           THE COURT:  I don't think you're objecting.  I think --

11           MR. WATSON:  Your Honor, --

12           MR. BOEHM:  No, I was just clarifying.

13           MR. WATSON:  -- that to me was more specific about the

14   agent's interpreting control and those type issues.

15           THE COURT:  If you feel like you need to make a

16   specific objection, I'm happy for you to do that.

17           MR. WATSON:  Yes, sir.  Thank you.

18   Q.   (BY MS. BOEHM)  On the top of the next page Daniel Settle is

19   specifically talking to her about her belief in him.  Can we

20   please take a look at that?

21           What is he referring to by the last two sentences, but

22   every now and then meet one that he really believes in, one he

23   thinks he can really count on?

24   A.   He is trying to tell her that when he ran into her and as he

25   was -- when he met her and as he started working with her he

1    thought that she was going to be a loyal participant in his

2    commercial sex enterprise and that he could really count on her

3    to follow what he was saying.

4    Q.    And he used the term loyal.  Is that common in his arena and

5    this type of activity?

6    A.    Loyalty in the mind of a pimp is huge.

7    Q.    Why?

8    A.    That's -- loyalty is everything to them.  It's I want to be

9    able to send you in, know that you're going to do exactly what I

10   tell you to do, that you're not going to go seeking another pimp

11   to work for or run off and do it on your own; that if you are

12   encountered by law enforcement that you're not going to turn

13   around and start talking to them and tell them that, you know,

14   I'm the one who is the pimp.  Just an overall sense of loyalty

15   that she will always be part of that organization.

16   Q.    Okay.  Can we turn to government -- or can we turn to page

17   8, please, of that exhibit?

18            So at the very top can we -- can we, please, focus in

19   on the top three blue bubbles?  So at the top he's saying,

20   "Bitch, call me back."  Do you commonly hear pimps in your

21   experience referring to the girls that work at their direction as

22   bitches?

23   A.    Yes.

24   Q.    And the middle statement by Mr. Settle, "I just gave you

25   instructions and you tell me to wait"?  What are instructions?

1  A.   It's exactly what he says.  He gave her instructions on what

2  to do.  He told her -- whatever he told her to do she didn't

3  respond immediately to.

4  Q.   And the next statement it says, "All that talk and all that

5  game.  All the many, many conversations we've had and you still

6  don't get it."  What's he referring to?

7  A.   He's basically -- I would be paraphrasing if I answered that

8  one, but he's basically talking about he's tried to explain to

9  her how to do it, how to do it right, and she's still not doing

10 it right.

11 Q.   Okay.  She's not meeting his expectations; is that right?

12 Now, if we can turn to Government's Exhibit --

13        MR. WATSON:  Your Honor, I object to leading and object

14 to continuing to speculate or opine on what these statements

15 mean.

16        THE COURT:  Speculation is overruled.  I think the

17 leading objection came too late.

18        MS. BOEHM:  Can we turn to Government's Exhibit 9, page

19 6, please?  And can you highlight conversations 56 through 60,

20 please?

21 Q.   (BY MS. BOEHM)  Now, Number 57, is faggot a terminology

22 commonly used in the sex trafficking game?

23 A.   Yes.

24 Q.   What does it mean, though?

25 A.   It's not in a sexual slur type of word.  The word fag refers

1    to fake game and faggot is someone who is engaging in a fake
2    game.
3    Q.   What does it mean, fake game?
4    A.   It can mean a bunch of different things.  They're not
5    following what they were told to do.  They could be intentionally
6    missing dates or intentionally missing phone calls that are
7    coming in or, you know, not walking "The Track" the way that they
8    want them to.
9    Q.   Okay.
10          MS. BOEHM:  And then can we zoom in on communications
11   62 through 66, please?
12   Q.   (BY MS. BOEHM)  Now, when we're going through and reading
13   these text messages, what color does AV1's communications appear
14   as?
15   A.   Purple.
16   Q.   And what does Daniel Settle's communication come through as?
17   A.   The green.
18   Q.   Now, on 62 what is "got a date"?
19   A.   That's her telling him that she has a customer.
20   Q.   And 65, he says, "How much will that be?"
21   A.   Correct.  He's asking how much money the customer is going
22   to pay.
23   Q.   And number 66, when she responds "like eight or nine some,"
24   what does that mean?
25   A.   It could mean a couple of different things, but it's a price

1   that the person is paying.

2   Q.   Now, could we, please, turn to page 7?  Conversation 67, 68

3   and 69 and 70.  On 67 when AV1 responds, "Or nine or band, I'll

4   count it," what is a band?

5   A.   She's referring to the amount of money.  Nine would be 900,

6   a band is a thousand.

7   Q.   All right.  And what is he telling her in 68?

8   A.   "Come in when you get a thousand."

9   Q.   Turning to page 10 of Government's Exhibit 9, down on 108.

10  What is she doing in this conversation?

11  A.   She's asking for permission to get food.

12  Q.   And what does "daddy" refer to?

13  A.   Daddy is a term that I frequently encounter.  It's the term

14  that the victims who are engaging in the commercial sex acts

15  refer to the pimp as.

16  Q.   Now, Daniel Settle is not AV1's actual father, correct?

17  A.   No.

18  Q.   But that's terminology for her pimp?

19  A.   Yes.

20  Q.   Why is it significant to you during your overall evaluation

21  of this relationship and the investigation that she's asking

22  permission to eat?

23  A.   It's control.  Again, she's having to ask just for

24  permission to go get food if she's hungry.  I mean, any other

25  person would just go get some food.  They wouldn't ask for

1    permission.

2             MS. BOEHM:  Can we turn to page 12, please,

3    conversations 130 through 132?

4    Q.   (BY MS. BOEHM)  Now, in response to AV1 Settle in 132 says,

5    "Bitch, I said come home."  What does that mean based on your

6    experience?

7    A.   It means that she's off on her own at this point.  From the

8    previous conversations it looks like she's maybe upset about

9    something.  And he's telling her right now you need to come to

10   me.  Come back.

11   Q.   And now some of these terms you're describing based on your

12   experience, right?

13   A.   Yes.

14   Q.   But you've also reviewed the entirety of these

15   conversations, correct?

16   A.   Yes.

17   Q.   So if we go to page 16 and we start with conversation 172

18   all the way down to 176.  Are they in an argument?

19   A.   Yes.

20   Q.   In 174 he tells her, "I'm really getting sick of you acting

21   like a fag every time I knock another bitch."  So what does knock

22   another bitch mean?

23   A.   Knock is a term that we use -- that they use for recruiting.

24   It usually involves reaching out on social media, gauging whether

25   or not they can recruit that potential person into their

1    commercial sex enterprise, or they may just walk up or drive up

2    to them on "The Track" and start talking to them that way.

3    Q.   Okay.  And number 175 he said, "You starting to act like my

4    MFBM."  What is an MFBM?

5    A.   Mother fucking baby mama.

6    Q.   Why is it so terrible to act like a baby mama?

7    A.   Because that -- that would demonstrate that it's no longer a

8    business relationship, that it's an emotional bond or an

9    emotional relationship, a boyfriend/girlfriend, husband/wife type

10   thing.

11   Q.   So why is that so bad?

12   A.   Because this isn't a boyfriend relationship.  This is --

13   this is business.  This is a business relationship.

14   Q.   And in 176 he says, "Want to be a good hoe when you the only

15   hoe, but show your ass and have a fucked up attitude every time

16   another bitch come along."  What's he telling her?

17   A.   That she's just fine when it's just him and her and that she

18   gets upset whenever he tries to recruit other people into the

19   commercial sex enterprise.

20         MS. BOEHM:  So can we go to page 18, please?  Starting

21   at 195 down to 198, please.

22   Q.   (BY MS. BOEHM)  Okay.  So what's going on in this series of

23   statements that he's making to AV1?  And why is this important to

24   their relationship?

25   A.   It's, again, a demonstration of who is in charge.  He's mad

```
 1  because the things that she's doing is making him look bad in
 2  front of others, other pimps that are out in that area.  He
 3  basically says, you know, I don't argue with my hoes.  You know,
 4  again, establishing that dominance, I'm in charge and I'm not
 5  going to argue with you.
 6  Q.   Okay.  And in 198 he says, "An MF would have thought you had
 7  learned to follow instructions after what happened to you."
 8  A.   Yes.
 9  Q.   What is that?
10  A.   He's referring to the time she was stabbed.
11  Q.   Because this conversation takes place when?
12  A.   In August.
13  Q.   Of 2020?
14  A.   Yeah.
15  Q.   And she was stabbed in May; is that right?
16  A.   That's correct.
17  Q.   The next page, specifically statements 217 and 218 -- I'm
18  sorry, page 20.  And if we could do 217 through 220.  Thanks.
19          So in 217 what is he talking about with regard to how
20  he's speaking to her, how he's lecturing her?
21  A.   It's basically -- he's arguing with her.  He doesn't like
22  the way that she's responding.  She's not doing what he's told --
23  what she's told.  She's 18 years old and basically trying to say
24  you're new to the game.  What do you know about being a pimp or
25  how a pimp acts -- is supposed to act.
```

1    Q.   And in 218 he talks about her arguing, how she's

2    disrespecting him.  And she keeps not following instructions,

3    "keep being out of pocket."  What is out of pocket?

4    A.   Out of pocket is just a term that they use for you're not

5    doing what I told you to do.  You're out there doing your own

6    thing.

7    Q.   Now, how important is it in looking at the context of these

8    conversations as well -- but how important is it to a pimp how

9    his victims make him feel?

10   A.   That's --

11           MR. WATSON:  Your Honor, objection, speculation.

12           THE COURT:  Overruled.

13   A.   The way that she acts in the street, especially if others

14   are around, will reflect directly on him as to how others

15   perceive him.  If they start viewing him as a fake pimp or a simp

16   or somebody who doesn't control their girls, that's going to have

17   a detrimental effect on his commercial sex enterprise.  It's

18   going to make it difficult for him to interact with other pimps

19   that may be in the area.  It's also going to make it far more

20   difficult for him to recruit other girls to come into the

21   organization to make more money as well.

22           MS. BOEHM:  Page 21, please.  And if we can highlight

23   conversation 221 through 223.

24   Q.   (BY MS. BOEHM)  221, what is that a reference to?

25   A.   Again, he's talking about how she got stabbed because she

1    didn't follow the instructions that he gave her.

2    Q.   And what does he mean in 223 when he says, "The game will

3    never let you prosper until you uphold your duties and carry

4    yourself like a real hoe"?

5    A.   It means that she's never going to be successful in his

6    organization until he's -- she starts doing what he tells her,

7    until she realizes her role as the hoe in the organization.

8    Q.   Okay.  Page 22, please, specifically conversation 241 and

9    242 at the bottom.  Daniel Settle in this conversation is talking

10   about Life 360.

11   A.   Yes.

12   Q.   What is Life 360?

13   A.   Life 360 is an app that was designed for primarily families

14   where you can sign in to a certain family and it will track that

15   phone's location.  It will give you the address where any phone

16   is located within that particular group.

17   Q.   Okay.  And why would a pimp want to have a family on

18   Life 360?

19   A.   To know where his girls are and that they're where he told

20   them to be.

21   Q.   So page 25, please, specifically 265 to 268.  You see

22   Mr. Settle and what he's doing in statement 265?

23   A.   That's a threat.

24   Q.   Why?

25   A.   He's basically saying I'm going to beat you and whoever

1  you're bringing.

2  Q.   Is that what "whooping" means?

3  A.   Yeah.

4  Q.   In 267 he says, "Bitch, you ain't shit.  You so MF

5  unappreciative and you gonna find out the hard way."  What's

6  that?

7  A.   Again, it's a threat.

8  Q.   How does she respond, though?

9  A.   Basically acquiescing to him, trying to say I do appreciate

10 you when you're acting right, but you keep trying to bring all

11 these other girls into what we're doing.

12 Q.   And page 26.  Can we go to 281, please?  What is "traps" in

13 this context?

14 A.   It's basically consistently working and staying in pocket.

15 Q.   Okay.  And he's talking to her about how she's, what,

16 falling short --

17 A.   Yes.

18 Q.   -- of her duties?

19 A.   She's not -- she's not doing -- living up to what he's

20 expecting basically.

21 Q.   And 282, the comment directly below.  It's on page 26.  "You

22 would realize you are a reflection of me and would never do

23 anything to make he look like less than the biggest MF pimp on

24 the planet."  Does that go back to what you were just telling the

25 jury?

1   A.   Yes, it's just a reference to how he is viewed in the

2   street, because he wants to be represented as the biggest pimp

3   who knows what he's doing, who is making a ton of money,

4   therefore, other girls will want to come work for him so they can

5   make even more money.

6   Q.   Page 28, please.  Conversation 298 up at the top.  What does

7   the phrase "choose up" mean?

8   A.   Choose up is a phrase that commonly refers to when a female

9   or a victim is tired of working for one pimp or is having a lot

10  of problems with one pimp or feels like they're being mistreated

11  by a pimp.  Or if they just think a better pimp comes along, the

12  term "choose up" refers to that girl deciding to leave the pimp

13  she's with and going to the other pimp.

14  Q.   And how important in this scenario between pimps and victims

15  are choices?

16  A.   Again, it's very important.  I mean, if the girls aren't

17  choosing to be with him, he's not going to make any money.

18         MS. BOEHM:  Can you highlight 299 through 300, please?

19  Q.   (BY MS. BOEHM)  What does he mean by you weren't conducting

20  yourself properly?

21  A.   Again, you weren't doing what I told you to do or what I

22  expect you to do.

23  Q.   And who does he refer to when he says "this family"?

24  A.   That's -- he's talking about his overall commercial sex

25  enterprise, other girls that he might have working for him.

1  Q.   Now, throughout your investigation you said you were aware

2  of different violent acts or crimes that occurred on "The Blade"

3  down at Harry Hines; is that right?

4  A.   It's known to be a very violent area, yes.

5  Q.   Did this seem to have any deterrence to Daniel Settle?

6  A.   No.

7          MS. BOEHM:  Can we, please, go to page 36 of

8  Government's 9?  And that's conversation 392.

9  Q.   (BY MS. BOEHM)  Now, this is AV1 talking to Settle; is that

10 correct?

11 A.   Correct.

12 Q.   Now, when she says, "Daddy, there's a P out here flashing

13 his gun, got people running," what is that?

14 A.   Daddy, there's a pimp out here flashing his gun and people

15 are running away.

16 Q.   And throughout this conversation do you see references and

17 conversation between AV1 and Settle about the violence that's

18 occurring down on "The Blade"?

19 A.   Yes.

20 Q.   Does he ever tell her to stop and come in?

21 A.   No.

22 Q.   Instead what does he continue to tell her to do?

23 A.   Just keep working, avoid the police.  There's a couple of

24 statements in there.

25          MS. BOEHM:  Can we turn to page 38, please,

1   conversation 414 through 417?

2   Q.   (BY MS. BOEHM)  Now, AV1 says in line 414, "I'm at 910 --

3   910 and I need one more."  What does that refer to?

4   A.   She just thinks she needs to turn one more trick or one more

5   commercial sex date to hit the one thousand dollars.

6   Q.   And what's his response?

7   A.   I'm not seeing it in here.

8   Q.   Oh, at 416 and 417.

9   A.   "You're sure?"  But that's from --

10  Q.   And what about 417?

11  A.   "Noncounting -- noncounting ass bitch."

12  Q.   Page 65 of this exhibit, conversation 732 and 733 up at the

13  top.  In the context of this communication when Settle says,

14  "I'll be at yo mama waiting; you going to you mama's house, huh,"

15  what is that?

16  A.   It's basically he knows where she's at and he's going to be

17  waiting for her when she gets there.  It's kind of a threat.

18  Q.   Because what do you know based on your investigation of

19  whether or not Adult Victim One ever left Settle?

20  A.   She would leave him occasionally when she got angry with

21  him.

22  Q.   Do you know where she would go?

23  A.   She would go stay with her mom.

24  Q.   And would she come back?

25  A.   Yes.

```
 1   Q.   How often do you see that in these situations in your
 2   experience?
 3   A.   It's quite frequent.
 4   Q.   And are you ever able to speak with victims about why they
 5   do that?
 6   A.   I do.  I ask them.
 7   Q.   Okay.  And, like you said, it's a common occurrence,
 8   correct?
 9   A.   Yes.
10   Q.   Now, down on page 65 at 740 and 741 at the bottom.  On 740
11   Settle says, "Come now and ain't nothin finna happen."  And 741
12   says, "But if you make me come in there it's finna be bad."
13   A.   Yeah.
14   Q.   What is that?
15   A.   It's basically kind of a get-out-of-jail-free card to start.
16   If you come now, nothing bad is going to happen.  We'll just move
17   on.  But if I have to come there; that's the threat aspect of it,
18   it's going to be bad.
19   Q.   Now, page 74, line 841.  What is this?  What does he mean
20   when he says, "I'm putting down one of the oldest moves in the
21   game right now.  Trying to lace you, because this move works so
22   much better with a down ass bitch that's cooperating"?
23   A.   He's basically trying to woo her.  I could get into -- I
24   don't know how much further I should go into it, but --
25   Q.   What is -- so what is trying to lace you mean?
```

1   A.   Lacing means I'm going to dress you up.   I'm going to buy

2   you like all kinds of fancy stuff.   I'm going to make you look

3   good.   I'm going to make you -- we're going to have this, quote,

4   relationship that's going on.

5   Q.   And so when he says, "I'm trying to lace you, because this

6   move works so much better with a down ass bitch that's

7   cooperating," what --

8   A.   He's referring to -- it's referring to the psychological

9   control as opposed to the physical violent control.   As long as

10  you're doing what I expect you to do and you're following the

11  rules, you're going to have all these nice things.   But if I have

12  to go the other route, that's just the way it's going to be.

13  Q.   Now, going through these records and you saw the

14  communication, did you determine that Adult Victim One was

15  working at his direction?

16  A.   Yes.

17  Q.   Now, in a sex trafficking world, are there --

18          MR. WATSON:   Calls for speculation, the previous

19  working at his direction.

20          THE COURT:   Overruled.

21  Q.   (BY MS. BOEHM)   In the sex trafficking world can a victim at

22  times appear to choose to engage in prostitution willingly, but

23  also still on the same hand be engaging in that at the force,

24  fraud or coercion of someone else?

25  A.   Yes.

```
 1  Q.    How is that possible?
 2  A.    Appearances can be deceiving.  They can present as being a
 3  willing participant of the organization, like I want to get out
 4  there, I want to do this, but then when you start getting down
 5  into the questions, you know, do you want to have sex with
 6  strangers?  No.  They can -- I'm trying to think of how I can
 7  explain it with --
 8  Q.    Well, like you said, it can appear willing at times,
 9  correct?
10  A.    Correct.
11  Q.    But then what does the statement that you see between the
12  two of them where she's asking permission to eat mean?
13  A.    Well, that's kind of what I'm trying to get into.
14  Appearances can be deceiving on the surface, but there's a lot
15  going on behind the scenes where the victim may not even realize
16  until they're removed from the situation, the psychological
17  control, such as, you know, "Can I go home and see my mother?"
18          "No, you can't go home and see your mother."
19          And that's -- or "I need permission to go get food" or,
20  "Hey, can I come home now?  I've only got $500."  Those types of
21  things.  They may not recognize it immediately as control until
22  they're removed from the situation.  So they might think just
23  because I'm not getting beat on a nightly basis I'm there
24  willingly when I'm really not there willingly.
25  Q.    Now, throughout this investigation you've reviewed records,
```

1   you've seen AV1, you've talked to family members.  But did you

2   ever get the opportunity to actually talk to Daniel Settle?

3   A.   Yes, we interviewed him.

4   Q.   How did you come into that opportunity to interview him?

5   A.   He had been arrested by the Dallas Police Department and was

6   being held at the Dallas County jail.

7   Q.   And when was that that you actually had the opportunity to

8   interview him?

9   A.   January 26th, '21.

10  Q.   Who was with you when you conducted that interview?

11  A.   Task force Officer Joe Swanson and Sergeant Hersgosi

12  (phonetic) from the Texas Attorney General's office.

13  Q.   And at the time of that interview was Daniel Settle charged

14  with any federal crimes related to sex trafficking?

15  A.   We had filed a criminal complaint on the federal level

16  charging him.

17  Q.   What's a criminal complaint?

18  A.   It's basically a probable cause affidavit that is presented

19  to the Court and reviewed by a judge.

20  Q.   Now, is that a grand jury indictment?

21  A.   No, it is not.

22  Q.   But can you put somebody in custody based on a criminal

23  complaint?

24  A.   Yes.

25  Q.   But was Mr. Settle already in custody?

1  A.    Yes.

2  Q.    And when you interviewed him did you make him aware of those

3  criminal charges?

4  A.    Yes, I did.

5  Q.    During this interview did you read him his Miranda rights?

6  A.    Yes.

7  Q.    And did he choose to waive those rights and speak with you?

8  A.    Yes, he did.

9  Q.    You had mentioned to the jury earlier about how sometimes

10  people suspected of sex trafficking actually do interview with

11  you; is that right?

12  A.    That's correct.

13  Q.    And some have refused to do so?

14  A.    Yes.

15  Q.    So do you follow the trust, but verify method with pimps as

16  well?

17  A.    Yes.

18  Q.    Why?

19  A.    It's important to corroborate everything that they say or

20  for reasons of proving it to be accurate or to be inaccurate.

21  Q.    Did you record the interview that you had with Daniel Settle

22  on January 26th, 2021?

23  A.    Yes, it was recorded.

24  Q.    Have you reviewed it fully?

25  A.    Yes.

1  Q.   And have you had the opportunity to listen to any clips that

2  were created from that full interview?

3  A.   Yes.

4  Q.   Now, I'm referring to what's already been admitted as

5  Government's Exhibit 10 and 10A through 10F.  Is that what you're

6  referring to?

7  A.   Yes.

8  Q.   During this interview there have been some parts muted; is

9  that correct?

10  A.   Correct.

11  Q.   Basically is all of -- anything you talk about appropriate

12  for a presentation to people other than investigative -- law

13  enforcement agents?

14  A.   No, there's information there that's not.

15  Q.   Okay.  And -- but is this recording complete except for

16  those muted parts?

17  A.   Yes.

18  Q.   When you made him aware of the criminal complaint, what was

19  the purpose of that?

20  A.   I just wanted to give him a realistic expectation of what

21  was going to happen in the future, the process that was going to

22  take place.

23  Q.   And did you walk him through what would happen after that

24  interview?

25  A.   Yes.

1  Q.   Would he eventually after that interview be taken into

2  federal custody on that criminal complaint?

3  A.   Yes.

4  Q.   And after your interview of him, did you have the

5  opportunity to interview Adult Victim One?

6  A.   I believe we interviewed her beforehand.

7  Q.   Okay.  Excuse me.  You interviewed her beforehand.

8  A.   Correct.

9  Q.   And you were the person who actually conducted that

10  interview?

11  A.   Correct.

12  Q.   Then you interviewed Daniel Settle?

13  A.   Correct.

14  Q.   And then eventually were you the agent who presented this

15  case to the grand jury?

16  A.   Yes, I was.

17  Q.   Did you testify in that grand jury?

18  A.   Yes.

19  Q.   And when was that?

20  A.   I don't remember the exact date of it.

21  Q.   Okay.

22  A.   It was shortly -- it was the day after that we interviewed

23  Adult Victim One, CR.

24  Q.   Okay.  Are you aware of whether or not a transcript is

25  actually created when you testify?

1   A.   They are.

2   Q.   Would it refresh your recollection as to the date if you

3   were able to see that transcript?

4   A.   Yes.

5           MS. BOEHM:   Permission to approach, Your Honor?

6           THE COURT:   Yes.

7   A.   Okay.

8   Q.   (BY MS. BOEHM)   What date did you testify before the grand

9   jury?

10  A.   February 2nd.

11  Q.   In a -- I'm going to take you back to Government's Exhibit

12  10, which is your interview.

13  A.   Okay.

14  Q.   When you went through and discussed this case with Daniel

15  Settle, what admissions did he make to you?

16  A.   He admitted that he was a pimp.  He admitted that he was

17  CR's pimp.  That he had received money that CR had earned by

18  engaging in commercial sex acts; that he had been violent with

19  CR on occasions, although he stated that he didn't use that

20  violence as a means of making her engage in commercial sex acts.

21          He stated that he was aware of the stabbing incident

22  that happened.  He, again, became upset about that and made

23  statements that basically it was his fault not in terms of he's

24  the one who stabbed her, but in that he was the one who had her

25  out there and she got stabbed.

1  Q.   Did he tell you or make any admissions as to why he believed

2  she got stabbed?

3  A.   Yes, she was out of pocket.

4  Q.   Did you have him define what "out of pocket" meant to him?

5  A.   Yes.

6  Q.   And what did he say?

7  A.   Not following what he told her to do.  He gave her very

8  specific instructions.  He referenced telling her to stay with

9  another female and not to take drugs and that she disobeyed both

10  of those orders and was stabbed.

11  Q.   What comments did he make to you, if any, about keeping tabs

12  on Adult Victim One?

13  A.   He would basically -- I mean, he would be out there with her

14  at times.  Other times he would be at home with his kid while

15  they were out on "The Track."

16            MS. BOEHM:  And, Your Honor, at this time we're going

17  to publish Government's Exhibit 10A.

18  Q.   (BY MS. BOEHM)  Is 10A a portion of the interview clip or of

19  the interview -- full interview with Daniel Settle?

20  A.   Yes.

21            (Audio being played before the jury.)

22            (Pause.)

23  Q.   (BY MS. BOEHM)  Who is Adrian Glover?

24  A.   Glover is another pimp who traffics girls.

25  Q.   And what is Daniel Settle saying in this clip?

1  A.   That Daniel Glover -- or Adrian Glover basically showed him

2  how to be a pimp, brought him into the game.

3           MS. BOEHM:  Can we publish 10B, please?

4           (Audio being played before the jury.)

5           (Pause.)

6  Q.   (BY MS. BOEHM)  And Special Agent Kochan, you just heard

7  Daniel Settle talking about that stabbing, correct?

8  A.   Correct.

9  Q.   Was he emotional?

10  A.   Very.

11  Q.   Did he seem sad?

12  A.   Yes.

13  Q.   The text messages that you went through exhaustively with

14  the jury in Government's Exhibit 9, do you remember the date of

15  those messages?

16  A.   The date was in August.

17  Q.   2020?

18  A.   Yes.

19  Q.   And through what date about?

20  A.   Mid September.

21  Q.   Okay.  Do you remember when the messages in Exhibit 8

22  happened?

23  A.   I don't --

24  Q.   Can you tell the jury when the messages in Exhibit 8

25  happened?

```
 1   A.    September 15th, 2020.

 2              THE COURT:  We are at 5:00 o'clock.

 3              MS. BOEHM:  Your Honor, I have two more questions.

 4              THE COURT:  Two more?

 5              MS. BOEHM:  Maybe three, but I'm going to keep

 6   it -- but under three.

 7              THE COURT:  Three and then you're done with this

 8   witness?

 9              MS. BOEHM:  I'm done with today.  I still have more

10   evidence to continue tomorrow.

11              THE COURT:  Okay.  Let's save the other three questions

12   for tomorrow.  That way you don't have to struggle to limit

13   yourself to three.

14              So have a very pleasant evening, have a safe trip home

15   and back.  If you could be back in our extra room over there.  I

16   can't quite call it a jury room, but if you can be back there

17   ready to go at 9:00, we'll start back up then.  So have a good

18   evening.  See you tomorrow.

19              COURT SECURITY OFFICER:  All rise for the jury.

20              (Trial adjourned for the day.)

21

22

23

24

25
```

```
 1                               INDEX

 2                                                   PAGE

 3   OPENING STATEMENT BY MS. BOEHM:                    9

 4

 5                                              Further
                  Direct   Cross   Redirect   Recross   Redirect
 6
     WITNESS FOR THE
 7   GOVERNMENT

 8   JOHN KOCHAN        17

 9

10   EXHIBIT INDEX

11   GOVERNMENT'S EXHIBITS
     NO.            OFFERED                   ADMITTED       VOL.
12
     4              36                        36            I
13   6              44                        45            I
     7              44                        45            I
14   8              44                        45            I
     9              44                        45            I
15   46             35                        35            I

16

17

18

19

20

21

22

23

24

25
```

1    I, Jeff L. Foster, United States Court Reporter for the

2  United States District Court in and for the Northern District of

3  Texas, Dallas Division, hereby certify that the above and

4  foregoing contains a true and correct transcription of the

5  proceedings in the above entitled and numbered cause.

6    WITNESS MY HAND on this 9th day of February, 2023.

7

8

9

10                                /s/ Jeff L. Foster
                                  JEFF L. FOSTER, RMR, CRR
11                                United States Court Reporter
                                  1100 Commerce St., Room 1504
12                                Dallas, Texas 75242
                                  (214) 753-2349
13

14

15

16

17

18

19

20

21

22

23

24

25